**Robert Vincent BILLS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F-76-940.**

Court of Criminal Appeals of Oklahoma.

Oct. 23, 1978.

---

E. J. Raymond, Drummond, Drummond, Raymond & Payne, Pawhuska, for appellant.

Larry Derryberry, Atty. Gen., Givens L. Adams, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

The appellant, Robert Vincent Bills, hereinafter referred to as defendant, was charged, tried before a jury and convicted in the District Court, Osage County, Case No. CRF–76–117, of the crime of Murder in the Second Degree in violation of 21 O.S. Supp.1976, § 701.8. Punishment was assessed at a term not less than ten (10) years nor more than life under the direction and control of the Department of Corrections of the State of Oklahoma. From a judgment and sentence in accordance with the verdict the defendant has perfected his timely appeal.

Briefly stated the evidence adduced at the trial is as follows, to-wit: Doris Boggs testified that she lived in Pawhuska and

that she had two brothers, Paul Woods, hereafter referred to as the victim and Ira Woods. On February 17, 1976, Ira Woods and Henry Campbell came by her house about 9:00 a. m., and as soon as the liquor store opened they all began drinking. At about noon she went to sleep and her visitors left. At 2:30 p. m. she was awakened by the defendant, who was crying and who told her that the victim was at his trailer and would she please come get him. He also showed her where the victim had hit him in the mouth causing him to spit blood. The two then walked to the defendant's trailer home and drank wine with Henry Campbell and the victim for two or three hours. Ira Woods was present and had been drinking, but felt badly and was lying on the defendant's bed when the witness and the victim left the trailer to return to her house.

Mrs. Boggs further testified that while she was at the defendant's trailer the victim and the defendant were talking and laughing. She stated that she did not hear any kind of argument between the victim and the defendant, and that although the defendant was drunk, the victim was not. After she and the victim returned to her house she asked him to go to the liquor store and get some wine, and he left, but did not return. She was later informed by Ira Woods that her brother was dead.

On cross-examination Mrs. Boggs stated that when the victim was drinking he did not get violent and she had never seen him strike anybody. She did state that he was "high-strung" and would sometimes get mad. She further related that she had never seen the victim carrying a weapon or knife and that she had been arrested numerous times for public drunkenness.

Henry Campbell then testified that he had known the defendant and Doris Boggs and her brothers for some time, and that on the day in question he drank wine at Doris' house and then went to the defendant's trailer. Later that afternoon Doris Boggs came to the trailer and drank more wine. He did not notice whether the victim and Mrs. Boggs left together. Later that evening he saw the victim lying outside the trailer and thought at first that he had passed out. But noticing blood he asked the defendant what was going on and the defendant cursed him and told him to leave. The witness then noticed that the defendant was holding a knife with a nine-inch blade, similar to a bayonet. He tried to stab the witness and the witness then went to the fire station to get help.

On cross-examination Campbell admitted that he had been arrested on numerous occasions for resisting arrest, assault and battery and public drunkenness, and stated that he had trouble remembering incidents on the day in question, because he had been drunk. However, he said that he saw no knife on or about the victim and had never seen him carry any type of weapon. He described the victim as being belligerent, especially when drinking, but did not recall over hearing any argument between the defendant and the victim on the day in question.

Ira Woods then testified that he was the victim's brother and that he was an alcoholic and had been arrested on numerous occasions for public drunkenness and related offenses. On the morning of the 17th he and Henry Campbell were at Doris Boggs' house where they drank wine until approximately 1:30 p. m., when he and Campbell left, they purchased more wine and went to the defendant's trailer. At about 3:00 p. m. the witness got sleepy and laid down inside the trailer. Later he heard his sister's voice but did not hear the victim. Later still he heard the defendant and Campbell arguing outside. At about 5:40 p. m. the defendant came into the trailer and the witness got up and joined him. He could hear Campbell talking loud and using profanity outside. The defendant then told the witness that he was mad at Campbell and the victim and that the victim had hit him earlier. The defendant further told the witness that he was getting "tired of guys come down there and jumpin' on him." The witness then saw the victim coming up to the trailer and told the defendant, "There comes Paul with another jug." The victim had only a bottle

of wine in his hand as he approached the trailer, and as he attempted to step through the partially opened door, he was smiling and offering the defendant the bottle. But the defendant jumped up, ran to the victim, pushed the bottle aside and hit at the victim twice. The witness did not see if anything was in the defendant's hand. The victim fell outside the trailer and did not make a sound. Henry Campbell then came up to help and the defendant told him to leave. Woods further stated that the victim fell before Campbell came up and that he saw nothing in Campbell's hand.

On cross-examination Woods stated that when his brother had been drinking he would sometimes become belligerent and want to argue. He further stated that he saw the defendant make two thrusting motions up under the side of the victim and that he was absolutely certain that the victim was carrying nothing but a "jug." He added that his brother did not carry a knife.

Dr. Bryce Bliss, a practicing pathologist, testified that he performed an autopsy on the body of the victim on February 18, 1976. He described the nature of five separate cutting or stab wounds. He stated that the cause of death was blood loss due to the multiple lacerations and that any one of the separate wounds could have caused death from bleeding. On redirect examination he said that it was possible that the wounds in the victim's back were exit wounds caused by a knife that had gone through the body.

Al Lowe of the Pawhuska Police Department then testified that on the evening of the 17th he received a regular dispatch and proceeded to the defendant's trailer, arriving after other officers. When he went in he observed the defendant sitting in a chair with a half-bottle of liquor in a paper sack and a long knife lying on a stool within reach of the defendant. The knife, which the witness identified in court, appeared to be a long bread knife with blood all over the blade.

Forensic chemist Ann Reed testified that she performed various tests upon the knife and determined that the stains on the blade were human blood, type "O" and were found to contain .28 per cent alcohol.

Bill Mitchell, Chief Criminal Investigator for the Sheriff of Osage County, identified numerous photographs of the victim's body and the long knife he had taken from the trailer. He also testified that he saw the defendant later that night at the Osage County Jail and that he was intoxicated and somewhat belligerent. The next morning he interviewed the defendant and took a statement from him, after advising him of his *Miranda* rights. The witness identified State's Exhibit No. 10 as a transcript of all the questions and answers asked and given during the interview. The transcript had been signed by the defendant was was admitted into evidence. In his statement the defendant related as follows: That during the day in question he saw Ira Woods and Henry Campbell downtown and that when he returned home they were there and they drank wine together; that the victim came to the defendant's trailer for the first time at about 5:00 p. m.; that the victim wanted him to go get a bottle and the defendant refused; that the victim got mad and hit the defendant in the mouth; and that the defendant did not ask the victim to leave but continued to drink wine. The statement further related that on his way to get another bottle he stopped by Doris Boggs' house and asked her to come get the victim since he did not want any trouble. The statement further related as follows:

"Q. She went back to your house with you, is that right?

A. Yes.

Q. Who all was there when she got back there with you?

A. As well as I can remember, it was Beaver and Paul, I guess. We went out back there and opened that bottle I had got, sat outside there in the chair, she was kidding about me saying, 'Oh, Paul hit me, .Oh Paul hit me'.

Q. She was kidding you about your telling her that Paul had hit you?

A. Making fun of me telling about Paul hitting me.

Q. Did she say anything to Paul with regards to leaving you alone?

A. I don't know if she did or not, she might have said something, I don't know.

Q. When Doris left, did she take Paul with her?

A. I don't know, I don't even remember when she left, whether she did or not.

Q. Had you had more to drink after you came back and talked to Doris and Paul together?

A. Yes, we sat back there drinking on that bottle.

Q. Sometime after this occurred, Doris and Paul both left, is that right?

A. I guess they did, yes.

Q. Do you recall going back into the trailer?

A. I guess I went back in. When they left, there wasn't anybody out there, I guess we drank all the wine, I guess, he went to get another one, I don't know.

Q. Bob, let me ask you this, do you recall sitting in the trailer, talking to Beaver while Paul was gone that last time?

A. I don't remember that.

Q. Do you recall Paul coming back to your house just after dark?

A. I remember me and him standing in the door, I guess we was arguing, I don't remember what I said or what he said. Then I remember looking down and seeing him lying in the walk there.

Q. You don't remember telling him not to come in your house?

A. I don't remember telling him that, but I must have because I don't know why . . . he must have threatened me again, I guess, I don't know why. I picked up the knife . . . if he hadn't . . I wasn't going to take any more.

Q. Do you remember feeling that way, that you weren't going to be run over any more?

A. I don't remember telling that to Beaver, but I think I had talked to him about it before.

Q. Do you remember what you said to him about it?

A. I don't remember what I said, but I know I must have said something about it.

Q. Do you remember saying something to Paul about it as he was standing outside your door?

A. I don't remember talking to Paul. I remember standing outside the door.

Q. Do you remember the knife in your hand?

A. I don't remember that, but I think I remember something about stabbing. I wanted to stab him or I was going to stab him. I don't remember if I hit him, but I remember hitting him with my fist, but then I kind of went blank.

Q. You don't remember picking up the knife at all?

A. I don't remember that at all. I don't even remember if I had it in my hand before he came, meaning to stick him with it or not.

Q. Do you remember after your seeing him lying on the ground, taking the knife back in and laying it somewhere?

A. No, I don't remember that. I don't remember whether you guys took it or I just laid it down.

Q. Do you remember having it in your hand when Henry came around the trailer?

A. I don't remember that, I don't remember anything about talking to him.

Q. Do you remember ever having a knife in your hand during that period of time at anytime?

A. I do remember something about something like this, just kind of.

Q. You do remember a stabbing motion?

A. I remember something about making a stabbing, I don't remember picking up the knife or lying it down. All I remember is when he

was lying out there. It didn't even occur to me then that I had stabbed him.

\*   \*   \*   \*   \*   \*

Q. Do you think the incident that occurred was a result of his hitting you in the face?

A. I know one thing, I wasn't going to let it happen again. I think I told Beaver that, I told Doris to get him out of here.

Q. Bob, at this time that this incident took place, how many bottles, to the best of your memory, had you consumed?

A. Two or three, I guess.

Q. Do you think that this partly responsible for your loss of memory?

A. I don't know what happened. Things are kind of fussed up. I am not sure what the devil did happen. I remember Paul lying there.

Q. Do you think someone else could have stabbed Paul?

A. No, I did. I know I did.

Q. How do you know you did it?

A. I am pretty sure I did it.

Q. Was there anyone else around at the time that you had this altercation with Paul in the doorway?

A. To the best of my knowledge, Beaver was in there, and I thought he was asleep, and I didn't know he witnessed it, and I didn't know Henry was there. I don't believe Henry did it. I did it, I guess, I remember, I don't know. It just seemed like a dream right in there that stabbing. I don't remember anybody saying 'That hurts, or My, god, what are you doing' or hollering at me. It was just like a dream, but I do know that I wasn't going to take any more, I wasn't going to be hit any more in any . . .'

\* \* \* "

On cross-examination Mitchell testified that an open knife was removed from the victim's back pocket later that evening. The State then rested.

The first defense witness was James Lampkin who testified concerning an incident occurring in July or August of the previous year, when he had observed the defendant drunk and in a dispute with the victim at the front door of the defendant's trailer. He recalled that blood was coming from the victim's face and the victim jerked the screen door half off and hit the defendant on the side of the head with a stick. Other than the one incident, the witness knew of no other disputes or fights between the parties. Deputy Sheriff Ralph Enloe then testified that he assisted in the investigation of the Woods' homicide and found an open pocket knife about 4 inches long in the right hip pocket of the victim's pants. On cross-examination he said that he had seen no other weapons on or about the victim's body during his investigation.

It was then stipulated that the defendant had been admitted to a mental hospital five times since 1966 and that four of the admissions had been since 1971. It was further stipulated that after the instant charge had been filed the defendant had been sent to Vinita and had been found competent to stand trial.

■ The defendant's first assignment of error urges that the trial court erred in refusing to grant his motion for funds for investigation and an independent psychiatric examination at the expense of the State. The defendant further urges that 22 O.S. 1971, § 1271 violates the equal protection clause of the Fourteenth Amendment to the United States Constitution by the disparity between the maximum amounts allowable to attorneys in counties of less than 200,000 population and to attorneys in counties of more than 200,000 population. The statute specifically provides that it shall not apply to counties of the greater population.

With reference to the trial court's failure to provide funds for an investigator and an independent psychiatrist, this Court in *Huitt v. State*, Okl.Cr., 562 P.2d 873 (1977), recently reaffirmed its decision in *Hardt v. State*, Okl.Cr., 490 P.2d 752 (1971), that under the statutes of the State of Oklaho-

ma trial courts are without authority to comply with such requests. See also *Bias v. State*, Okl.Cr., 561 P.2d 523 (1977).

The application of the challenged statute solely to smaller counties arises out of the creation by the Legislature of an office of Public Defender in counties possessing a population of over 200,000. See, 19 O.S. 1971, §§ 138.1 et seq. Therefore the distinction between the smaller and larger counties found in the challenged statute arises out of a legitimate state interest and does not result in unlawful discrimination. Indigent defendants in any county of the State of Oklahoma are afforded the protection of competent counsel, whether they are salaried under the public defender system or paid out of the court funds. The defendant's first assignment of error is without merit.

The defendant's second assignment of error asserts that the trial court erred in refusing to submit to the jury the defendant's requested instructions concerning self-defense and insanity. Again we disagree.

■ It is fundamental that the trial court must instruct on the law applicable to a theory of the defense if the issue has some basis and support in the evidence. *Carter v. State*, Okl.Cr., 507 P.2d 932 (1973) and *Adams v. State*, 93 Okl.Cr. 333, 228 P.2d 195 (1951).

■ With reference to a defense of insanity, the defendant is presumed to be sane and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity. *Gonzales v. State*, Okl.Cr., 388 P.2d 312 (1964). In the instant case there was no evidence presented which tended to rebut the presumption of sanity. The record reveals that the trial court, prior to trial, ordered the defendant admitted to Eastern State Hospital at Vinita for psychiatric evaluation, and that it was the opinion of the staff of that hospital that the defendant was not insane according to the laws of the State of Oklahoma, that he was able to accurately distinguish between right and wrong and that he was capable of advising legal counsel in his own

defense. It was further stipulated during trial that the defendant was competent to stand trial. There being no evidence tending to rebut the presumption of sanity, the trial court properly refused the requested instruction.

The record shows that the trial court did submit instructions concerning self-defense in the language of the applicable statutes. However, an examination of the record reveals that there was no need for such instructions since no evidence was presented at trial which would support a defense of self-defense.

At about 2:30 p. m. the sister of the victim was awakened by the defendant who informed her that the victim had hit him in the mouth and requested that she come and take her brother home. She then went to the defendant's trailer and stayed for two or three hours drinking wine with the defendant, the victim and others. During this period of time the defendant and the victim were talking and laughing and nothing appears in the record which would indicate that any dispute occurred between the defendant and the victim. Ira Woods testified that he later observed his brother approach the trailer with only a bottle of wine in a paper sack. When the victim came to the door he was smiling and offered the bottle to the defendant. No words were spoken when the defendant went to the door and made two thrusting motions toward the victim, who fell to the ground.

■ In *McKee v. State*, Okl.Cr., 372 P.2d 243 (1962), this Court held that fear alone is not enough to justify one person to take the life of another. Such fear must have been induced by some overt act, gesture, or words spoken by the deceased at the time the homicide occurred, which would be a reasonable ground for a belief by the defendant that he was about to suffer death or great bodily harm. It is therefore apparent that it was not necessary for the trial court to instruct the jury on the theory of self-defense and its failure to submit the requested instructions was not error.

The defendant's final assignment of error contends that the trial court erred in admitting into evidence certain color photographs which had no probative value and which were highly prejudicial to the defense.

In *Oxendine v. State*, Okl.Cr., 335 P.2d 940 (1958), we set out the following guidelines for the introduction of photographs:

"2. If the principal effect of demonstrative evidence such as photographs is to arouse the passion of the jury and inflame them against the defendant because of the horror of the crime, the evidence must be excluded.

3. On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passion of the jury."

We went on to hold in *Oxendine* that five color slides of the murder victim's nude body taken after extensive autopsy surgery had been performed were of no probative value as evidence of gunshot wounds.

However, in the instant case the photographs introduced were of the victim's body at the scene and after being removed to the funeral home but before the autopsy. They tended to corroborate the findings of the pathologist and to show the size of the knife and the force behind the thrusts. We further hold that the small photographs are not so gruesome as to cross the line between probative value and prejudicial evidence. *Bias v. State*, supra. The defendant's last assignment of error is without merit.

After a thorough examination of the transcript and the record it is our opinion that the defendant received a fair and impartial trial before a jury, that no substantial right of the defendant was prejudiced and that the judgment and sentence appealed from should be, and the same is hereby AFFIRMED.

CORNISH and BRETT, JJ., concur.