Lena B. SMITH, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-80-423.

Court of Criminal Appeals of Oklahoma.

Sept. 7, 1982.

Jess Horn, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Michael Scott Fern, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Judge:

The extraordinary circumstances of this case require that it be reversed and remanded for a new trial. The pertinent facts are as follows:

On Sunday, October 8, 1978, the appellant, Lena Smith, drove her automobile into a Sav-Go gasoline station in Yukon and commenced honking her horn until someone came out of the building to her car. The appellant instructed that person to call an ambulance. It was subsequently discovered that the passengers in the appellant's car, her two young granddaughters, had been gravely wounded by gunshots. One of the children was killed by a .44 caliber slug which passed completely through her body and embedded in the front car seat. The bullet was fired less than thirty (30) inches from the victim. The other child was severely wounded by a .38 caliber slug which likewise passed through her body and embedded itself in the front car seat. That bullet was fired from a distance of twelve (12) inches. The appellant was also severely wounded. A third slug was not found in the automobile.

The appellant was arrested and charged with Murder in the First Degree and Shooting with Intent to Kill. She first appeared before the district court on November 1, 1978. She was represented by attorneys Richard J. Burton, of Washington, D.C., and Jess Horn of Oklahoma City, Oklahoma.

Pursuant to an order of the district court, the appellant was sent to Central State Griffin Memorial Hospital in Norman, Oklahoma, for sixty days' psychiatric observation on November 1, 1978. In a letter dated December 27, 1978, Dr. Loraine Schmidt, Chief of Forensic Psychiatry at Hayden H. Donahue Mental Health Institute, informed the prosecuting attorney and the district court that she believed the appellant was not competent to stand trial.[1]

The appellant appeared in court on December 29, 1978, in regard to the letter.

---

1. The letter written by Dr. Schmidt was in response to the District Attorney's request that

She was not accompanied by counsel. According to the bench notes in the record, one of the appellant's attorneys, Jess Horn, was contacted that same day by the judge concerning the letter. The appellant was readmitted to Central State for treatment.

On June 6, 1979, the appellant, having been adjudged competent to stand trial, was once again brought before the district court. She was advised of her rights and read the information filed against her. She was accompanied by her attorney, Jess Horn.

Pursuant to an order to undergo psychiatric examination, dated June 26, 1979, the appellant was examined by Dr. Nolan Armstrong, M.D., an Oklahoma City psychiatrist. Dr. Armstrong was selected by stipulation between the State and the appellant. The State compensated Dr. Armstrong for his services. Based on his observations of the appellant, Dr. Armstrong concluded that she was suffering from a mental illness which prevented her from knowing right from wrong when the shootings occurred.

The appellant's preliminary hearing was held on July 10, 1979. Counsel for the appellant was Jim Hugh Rinehart. Mr. Rinehart additionally represented the appellant before the district court in an application for bond reduction on July 12, 1979, and at the July 13, 1979 arraignment. Mr. Rinehart was permitted to withdraw from the case at the September 9, 1979, pre-trial conference. Jess Horn was substituted as the appellant's attorney.

The trial was held on October 10, 1979, with Jess Horn as counsel. The defense was insanity. The appellant presented Dr. Armstrong as an expert witness concerning her state of mind at the time of the shoot-

ings. Dr. Loraine Schmidt was subpoenaed by the State, but was not called to testify.

Evidence was adduced at trial to demonstrate that the appellant had a history of mental illness. She received shock treatment and medication for depression in an Amarillo, Texas, clinic as both an in-patient and an out-patient in 1964. In 1974, she was again treated with shock therapy, and was placed on medication consisting in part of forty (40) milligrams of valium per day. She continued taking the medication until sometime after the shootings occurred.

Numerous items found inside the appellant's car on the day of the shootings were introduced into evidence. Among those items were: a .38 caliber pistol and a .44 caliber pistol found lying in the front seat;[2] a .38 caliber slug and a .44 caliber slug, both of which were taken from inside the front car seat,[3] a note which the appellant had written and placed on the dashboard directing her husband's attention to approximately $5,600 in cash inside the glove compartment; and a note found inside the appellant's purse behind the driver's seat which instructed that the bodies of the appellant and her granddaughters be buried in the Yukon cemetery without notification of the appellant's relatives.

The appellant was convicted by a jury of the charges of First Degree Murder and Shooting with Intent to Kill. She was sentenced to life imprisonment for the murder, and to twenty-five (25) years' imprisonment for Shooting with Intent to Kill. Trial counsel is counsel on appeal.

Our primary concern in this case is the appellant's insanity defense.

Although two psychiatrists observed the appellant subsequent to the shootings,

Dr. Schmidt evaluate the appellant to determine: 1) the appellant's competency to stand trial; and 2) the appellant's sanity at the time of the shootings. (State's Exhibit No. 38) The content of Dr. Schmidt's letter has become a matter of great concern to this Court, but was unfortunately never made a part of the record. It has been ascertained from testimony in the record before us, however, that the letter addressed only the question of the appellant's competency to stand trial.

2. The appellant stipulated at trial that the children were shot with those weapons.

3. Ballistics tests performed by the OSBI indicated that the bullets found embedded in the car seat were fired from the two pistols found in the car. The appellant so stipulated at trial.

only one, Dr. Armstrong, was called to testify. We believe that the omission of Dr. Schmidt's testimony reflects an extreme lack of diligence on the part of counsel for the appellant to ensure the appellant received a fair trial.

As noted above, the appellant was admitted to Central State Hospital in Norman by court order where she was evaluated for sixty days under the supervision of Dr. Schmidt. Although Dr. Schmidt's letter of December 27, 1978, addressed only the question of the appellant's competence to stand trial,[4] Dr. Schmidt testified during the hearing on the appellant's motion for a new trial that she was also of the opinion the appellant was insane at the time of the shootings. Dr. Schmidt further testified that she so informed the prosecutor prior to the appellant's trial.[5]

Counsel for the appellant was apparently not aware of Dr. Schmidt's opinion concerning the appellant's sanity at the time of the shootings prior to trial. He was, however, aware that Dr. Schmidt considered the appellant incompetent to stand trial in December of 1978. He was contacted by the district court concerning the matter when he was representing the appellant at that time, and was furnished a copy of Dr. Schmidt's letter dated December 27, 1978, when he re-entered the case approximately one month prior to the appellant's trial.

Counsel for the appellant admits that he made no effort before commencement of the trial to contact Dr. Schmidt to ascertain what her testimony might be. He attributes this failure to a combination of two factors: first, that, in his opinion, Dr. Schmidt had a reputation as a witness not favorable to defendants in criminal cases; and, secondly, that Dr. Schmidt had been subpoenaed by the State. He argues that these two factors led him to assume Dr. Schmidt's testimony would have been unfavorable to the appellant.

Initially, we cannot say that counsel's assumptions of Dr. Schmidt's opinion in this case were well-founded. Dr. Schmidt saw the appellant soon after the shootings occurred, and had an opportunity to observe her for an extended period of time, as counsel well knew. On the basis of her observation, Dr. Schmidt was of the opinion the appellant was not competent to stand trial, as counsel also knew. This assessment came less than ninety days after the shootings occurred. We find it difficult to believe that, the subpoena notwithstanding, appellant's counsel never entertained a thought that the psychiatrist who found his client incompetent such a short time after the acts were committed could possibly have an opinion of her sanity at the time of the shootings which could prove useful to the insanity defense.[6]

Not only was counsel unjustified in making the assumptions he did, he was further unjustified in relying on those assumptions in his preparation for trial. The American Bar Association Standard for Criminal Justice, Defense Function 4–4.1 maintains in part that,

It is the duty of the lawyer to conduct a prompt investigation of the circumstanc-

---

**4.** See footnote 1, infra.

**5.** The appellant argues that the prosecutor concealed Dr. Schmidt's opinion in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by issuing her a subpoena. He argues the subpoena led him to believe Dr. Schmidt's opinion was not exculpatory to the appellant. We interpret the appellant's argument as an attempt to use *Brady* to push onto the prosecutor's shoulders the consequences of his own lack of diligence. The appellant's counsel was made aware of Dr. Schmidt's role in the case, and of her opinion of the appellant's competence to stand trial. We find this information was sufficient to put appellant's counsel on notice that Dr. Schmidt was a witness worth investigating. The prosecutor fulfilled his *Brady* duty.

**6.** We would agree that, in most circumstances, the State would not issue a subpoena to persons who would testify adversely to its case. However, even given this generalization, the defense is not relieved of its investigative responsibilities. In this particular case, the circumstances of the appellant's extensive contacts with Dr. Schmidt and those under her supervision render a decision not to consult her patently unreasonable. The appellant's counsel, in effect, allowed the State to dictate preparation of the defense through the subpoena.

es of the case and *to explore all avenues leading to facts relevant to the merits of the case* and the penalty in the event of conviction. (Emphasis added).

This case did not demand novel or extensive investigative techniques, nor was it an example wherein the omitted witness could not be located. Dr. Schmidt is a state employee whose professional position, place of business, and personal address were made known to the appellant's counsel prior to trial. The effort counsel would have had to exert to contact Dr. Schmidt was miniscule in comparison to the gravity of the situation. The appellant was charged with Murder in the First Degree and Shooting with Intent to Kill. A bill of particulars had been filed. Counsel should have realized his affirmative duty in such an extreme and crucial case to assemble all possible information relevant to the only defense his client had.

■ We recognize that the attorney for a defendant may, at times, have legitimate reasons for not calling certain witnesses to testify. The decision of which witness, if any, to call at trial is one of strategy best left to counsel, and generally will not be second-guessed on appeal. See, *Kelsey v. State,* 569 P.2d 1028 (Okl.Cr.1977); *Davison v. State of Oklahoma,* 428 F.Supp. 34 (W.D.Okl.1976). Before counsel may make such tactical decisions, however, it is imperative that he have knowledge of the substance of the evidence excluded. Thus, when, as in the present case, counsel knows of the existence of a person or persons who possess information relevant to the client's case and fails to exercise ordinary diligence to pursue that evidence, we cannot justify such lack of industry as strategic error. See, *In Re Hall,* 30 Cal.3d 408, 179 Cal.Rptr. 223, 637 P.2d 690 (Cal.Sup.1981).

Counsel in this case was charged with a responsibility of paramount import. We can only conclude that, in his deliberate failure to make any contact with a witness who had made such close and substantial contact with the appellant concerning matters so crucial to the defense interposed, counsel for the appellant failed to fulfill his duty to adequately prepare for trial.

■ Thus, this case presents the extraordinary situation wherein this Court is convinced that the representation provided the appellant by her retained counsel was ineffective, but the issue was not raised on appeal.[7] Ordinarily the burden of proving ineffective assistance of trial counsel rests heavily upon the appellant's shoulders. *Hill v. State,* 567 P.2d 516 (Okl.Cr.1977). We are thus faced with the hard decision between raising the error and granting relief *sua sponte,* or allowing the error to remain untouched because it was not raised.

We recognize the delicate and unique nature of raising ineffective assistance *sua sponte.* However, to overlook the grave error committed by the appellant's attorney at and before trial in this particular case would constitute a great wrong. Were we to turn our heads from the error before us today, we would sanction the deprivation of a citizen's liberty without benefit of a fair trial on all the issues.

In measuring the effectiveness of counsel's performance, we must look to the standard for effective assistance of counsel existing when the trial was held. The standard at that time in Oklahoma was that relief upon the ground of ineffective assistance of counsel would be granted only when the trial was a farce or mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation. *Eide v. State,* 551 P.2d 275 (Okl.Cr.1976).

The appellant has not had the benefit of an appropriate adjudication of her defense. The conscience of this Court cannot permit her judgments and sentences to stand without a complete adjudication. We believe that any attorney, acting in a prudent and effective manner would not have chosen the course of inaction chosen by the appellant's counsel. We cannot say the appellant has suffered no prejudice.

---

7. Since counsel on appeal was trial counsel, we would hardly expect such an issue to be raised.

We do not say that Dr. Schmidt's testimony would have convinced the jury to find the appellant not guilty because of her state of mind at the time of the shootings. It is sufficient to say that her opinion could have materially affected the outcome of the trial, and that the appellant was denied a fair trial because of her counsel's failure to discover and present it.

The appellant's insanity defense was further tainted when the prosecuting attorney conducted the cross-examination of Dr. Nolan Armstrong in an improper manner.

Pursuant to a motion in limine made by the State, the appellant was not allowed to establish the fact before the jury that the State stipulated to and paid for Dr. Armstrong's evaluation of the appellant. With the appellant's hands thus bound, the prosecution proceeded on cross-examination to imply that Dr. Armstrong was hired by the appellant and that he made a practice of being hired by defendants to testify that they are insane.

█ We cannot say that the prosecutor's inferences were a harmless impeachment tactic. The prosecutor made every effort to discount testimony that went to the very heart of the case by inferring matters he knew to be untrue. Such conduct is impermissible. Prosecutors must refrain from asking questions which clearly have for their purpose insinuation of something to the jury that is wrong. *Flynn v. State*, 68 Okl.Cr. 72, 96 P.2d 96 (1939); *Neely v. State*, 60 Okl.Cr. 99, 61 P.2d 741 (1936).

In light of these remarks, the trial court should have allowed the appellant to bring out the fact that the State played a role in the selection and compensation of Dr. Armstrong. The trial court's failure to do so allowed the prosecution's improper inferences to stand uncontested. We must conclude that the appellant was prejudiced thereby.

Having concluded that the appellant was effectively denied her insanity defense by the action and inaction of counsel for both sides, we address one final issue pertinent to re-trial.

█ State's Exhibit Number 34, a three-inch by five-inch posed photograph of the victims, which was taken sometime prior to the shootings, was improperly admitted into evidence. We have disapproved of the use of "before" photographs of victims in previous cases. Citing *Hudman v. State*, 89 Okl.Cr. 160, 205 P.2d 1175 (1949) [8] in *Ritchie v. State*, 632 P.2d 1244 (Okl.Cr.1981),[9] we indicated that such pictures lack relevancy in criminal cases;

> The jury should not have been concerned with what the child looked like prior to the offense committed against her, but instead it should have been concerned only with what had been done to the child, how it was done, when it was done, and who did it. 632 P.2d at 1246.

Although the trial court admonished the jury to consider the photograph only insofar as it proved the identity of the victims, we cannot say the error was cured. The prejudicial nature of the photograph was great, especially in light of the fact that it had no relevance. A photograph of this nature may arouse as many passions in a juror's

---

8. In *Hudman,* the trial court permitted the prosecution to introduce photographs of the victim of a homicide which had been taken prior to the homicide. The photographs, which depicted the victim in a sailor's uniform, were held to be of little or no relevance in this case, and of undue prejudice to the jury. The erroneous admission of the photograph was only one of many errors committed at that trial which prompted the reduction of the defendant's sentence for manslaughter in the first degree from thirty years' imprisonment to twenty years' imprisonment.

9. The photograph of the child was only a contributing factor in the *Ritchie* decision. That case was reversed and remanded for a new trial primarily because of the introduction of gruesome photographs of the autopsy performed on the child.

The photograph in the instant case is distinguishable from that in *Ritchie* because it was much smaller and not posted on a bulletin board for the jury to view throughout the trial. The photograph was, however, flashed before the jury at different points in the trial, and was taken into the jury room during deliberations. The principle espoused in *Ritchie* applies to the present case.

mind as one depicting a gruesome scene. The photograph of the cherubic little girls served only to highlight the unfortunate fact that untimely death and injury had been visited upon them.

The photograph resulted in unfair prejudice which must be avoided on retrial.[10]

The remaining issues raised by the appellant need not be addressed. They concern matters peculiar to the appellant's first trial and will not affect the second.

For the reasons herein stated, the appellant's convictions for Murder in the First Degree and Shooting with Intent to Kill are REVERSED and REMANDED for a new trial.

CORNISH, J., concurs.

BRETT, P. J., concurs in results.

---

**10.** We note that the introduction of photographs of victims taken prior to criminal acts against them is not reversible error standing alone. However, in the words of *Ritchie*, supra, "In a close case, on appeal, such a photograph may well tip the scales in the appellant's favor." 632 P.2d at 1246. We do not encourage the use of "before" pictures in trials. Should the need to identify the victim(s) in a criminal case arise, there are many alternative forms of identification readily available to the State without resort to items which carry such prejudicial impact.