Philip Wynn FRAZIER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-80-350.

Court of Criminal Appeals of Oklahoma.

Nov. 16, 1982.

Garvin A. Isaacs, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Robert W. Cole, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Judge:

The appellant, Philip Wynn Frazier, was convicted of Murder in the Second Degree, in a non-jury trial, in Tulsa County District Court, Case No. CRF–75–1439, and this Court has granted his motion for appeal out of time.

The uncontroverted facts of this case are that in the early morning of June 30, 1975, the appellant went to the apartment of Cliff Brown and Gary Nix. Nix testified that the appellant engaged in light conversation with them for a few minutes regarding the recent loss of his job and his plans to move to Kansas, he then announced that he had forgotten something outside in his car, and was going to get it and be back shortly. He did return quickly, but with a .12 gauge shotgun, with which he shot Cliff Brown twice, causing the latter's death. The witness stated that he subsequently learned that the deceased was a confidential informant, seeking to uncover drug dealings of Frisco Railroad employees; and further testified that prior to the homi-

cide the appellant had approached him and offered to sell drugs.

Frank Murphy testified that he was washing his clothes at an apartment complex in Tulsa in the early morning of June 30, 1975, when he heard "two loud bangs." He saw a man "taking two steps at a time" come down the stairway of a building and run around a corner. The person he saw was carrying a long-barrelled rifle or shotgun, and entered a brown Chevrolet and drove approximately 75 to 100 yards before turning on the automobile headlights.

■ On appeal, the appellant alleges that he was insane at the time of trial and that he should not have been tried while in such a state. See, 22 O.S.1981, § 1161. As we stated in *Bills v. State*, 585 P.2d 1366 (Okl.Cr.1978), a "defendant is presumed to be sane and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity." In the case at bar, as in *Bills*, supra, the record reveals that the trial court, prior to trial, ordered the appellant admitted to Eastern State Hospital at Vinita for psychiatric evaluation. The staff of that hospital changed its original opinion of the appellant's condition,[1] and in a letter dated January 15, 1976, received from Dr. R.D. Garcia, Chief Forensic Psychiatrist, stated that it was their opinion that the appellant was able to "accurately distinguish between right and wrong," was "capable of advising legal counsel in his own defense," and "he could now be considered sane according to the laws of the State of Oklahoma." There was no evidence presented which tended to rebut the presumption of the appellant's sanity at the time of trial. This assignment of error is without merit, see, *Bills*, supra.

In another assignment of error, the appellant, relying upon *Henderson v. Morgan*,

---

1. The record reflects that four (4) letters were received by the trial court from Eastern State Hospital; the first, dated July 15, 1975, signed by Dr. Joe E. Tyler, acting Superintendent, stated, in essence, that Frazier was insane according to the laws of the State of Oklahoma, and was unable to aid in his own defense; the second, dated September 16, 1975, signed by Dr. O.L. Hill, acting Superintendent, stated that

Frazier was considered sane according to the laws of the State of Oklahoma, could distinguish between right and wrong and aid in his defense, and was not on medication at the present; the third letter, dated October 1, 1975, signed by Dr. Joe E. Tyler, stated Frazier was still competent to stand trial and if he were not under the jurisdiction of the court he would be discharged and treated as an out-patient.

426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), alleges that he did not knowingly and intelligently waive his rights to a preliminary hearing and a jury trial. We do not agree.

■ First, it should be noted that *Henderson,* supra, dealt with the voluntariness of a plea of guilty, not the waiver of a preliminary hearing or a jury trial. Moreover, a review of the record before us reveals that the trial court, who was accutely aware of the appellant's mental history, as his testimony at a post-conviction hearing clearly demonstrates, and who had the benefit of actually observing the demeanor of the appellant, informed him of his rights, which his trial attorney advised him to waive,[2] and that the appellant agreed to waive them. Whether or not the accused knowingly waives his constitutional right to a jury trial depends upon the particular facts and circumstances of each case; here, we find that the waiver was knowingly and intelligently made. See, *Cole v. State,* 569 P.2d 470 (Okl.Cr.1977), and cases cited therein. This assignment of error is without merit.

■ The appellant also contends that he was denied effective assistance of counsel,

2. The following testimony of defense counsel at a post-conviction hearing held on May 22, 1979, reveals his reasons for adopting his strategy of waiving the preliminary hearing and the jury trial:

Q. Now, did you have a reason for waiving the preliminary hearing, Mr. Brown?
A. Yes, sir.
Q. What was that, please?
A. Well, there were several reasons: Number 1, as far as I was concerned there was no question about who killed the decedent in this case and how it transpired.

After conferring with Mrs. Frazier and members of the family, all of us concluded that the only defense, only possible defense, was insanity at the time of the commission of the crime, and that was the reason for arranging hospitalization and what have you.

Immediately after the incident occurred, in addition to that, there were some things that I didn't particularly want the State to become aware of.
Q. Specifically, what were those things, please?
A. Well, there were several things. Number 1, Mrs. Frazier has a relative or a friend of a relative who had been working for the police department, and that party pilfered out from the police department a copy of Mrs. Nicks' statement that [was] given to me before the trial. I had the benefit of knowing what the eye witness would say in his statement to the police department. So quite frankly I didn't feel that part of it at the preliminary hearing would be particularly beneficial one way or the other. (PCR 5–22–79, pp. 43 & 44).

\* \* \* \* \* \*

Furthermore,
A. ... I had found out that Philip had bought the weapon using a fictitious name. He advised me of this; that he had used a fictitious name to buy the weapon sometime before the shooting; that he hid it at his house. I figured the least said about the weapon the better everybody would be because that would tend to establish two things; number 1, premeditation. Obviously, if you meditate you tend to know the difference between right and wrong. (p. 45)

\* \* \* \* \* \*

The only thing they knew about the weapon was that it had been found in the field out here, I think on Mingo. They didn't know he had purchased it using a fictitious name.

Like I said, if he had a preliminary hearing the State would no doubt become curious about the weapon, the acquisition of the weapon, and I figured I could sit there and sandbag them, frankly. (p. 46)

\* \* \* \* \* \*

Q. Was there a reason you waived jury trial in this case?
A. Yes, sir.
Q. What was that, please?
A. I've tried I don't know how many murder cases, but I have attempted, I might add unsuccessfully and seen a number of other lawyers unsuccessfully, until very, very recently, to use the defense of insanity at the time of the commission of the crime. And that means, essentially, you get up and say, 'Yes, I did it, but didn't know what I was doing at the time I did it.' And, there are so many problems that arise when you try this particular kind of lawsuit relating to that, and it is difficult, real difficult to get a jury to accept that 'as a defense, because you're going to end up with an instruction regarding present sanity. That is one of the problems, and I figured, frankly, if I pushed the State on this thing: Number 1, they were going to be a little better prepared with regard to the weapon, and some of the other problems that arise during the course of a trial, and I made it just as simple and easy as I could. (pp. 48 & 49).

The entire text of Mr. Brown's testimony is found between pages 40 and 75 in the transcript of the post-conviction hearing held on May 22, 1979.

specifically, he alleges that his trial counsel, Robert G. Brown, failed to investigate and explore all avenues leading to facts relevant to guilt and degree of guilt, as would a reasonably competent attorney. In our recent decision of *Smith v. State,* 650 P.2d 904 (Okl.Cr.1982), in which we reversed convictions of Murder in the First Degree and Shooting with Intent to Kill, and remanded the case for a new trial because trial counsel made no effort before commencement of the trial to contact the State's psychiatrist, who had written a letter stating that the defendant was incompetent to stand trial, we noted that the American Bar Association Standard for Criminal Justice, Defense Function 4–4.1 maintains in part that:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and *to explore all avenues leading to facts relevant to the merits of the case* and the penalty in the event of conviction. (Emphasis added).

Further, in *Smith,* supra, we stated as follows:

> We recognize that the attorney for a defendant may, at times, have legitimate reasons for not calling certain witnesses to testify. The decision of which witness, if any, to call at trial is one of strategy best left to counsel, and generally will not be second-guessed on appeal. See, *Kelsey v. State,* 569 P.2d 1028 (Okl.Cr.1977); *Davison v. State of Oklahoma,* 428 F.Supp. 34 (W.D.Okl.1976). Before counsel may make such tactical decisions, however, it is imperative that he have knowledge of the substance of the evidence excluded. Thus, when, as in the present case, counsel knows of the existence of a person or persons who possess

information relevant to the client's case and fails to exercise ordinary diligence to pursue that evidence, we cannot justify such lack of industry as strategic error. See, *In Re Hall,* 179 Cal.Rptr. 223, 30 Cal.3d 408, 637 P.2d 690 (Cal.Sup.1981).

After a thorough review of the records before us, we find that the facts in the present case are distinguishable from those which warranted reversal in *Smith,* supra. Whereas in *Smith,* no effort was made by defense counsel prior to trial to ascertain the opinion of the State's psychiatrist regarding the sanity of his client, in the case at bar, the defense counsel, at a post-conviction evidentiary hearing, testified that he talked with Dr. Garcia on several occasions, and even subpoenaed Dr. Garcia and Dr. Tyler on one occasion. Mr. Brown, however, declined to call Dr. Garcia as a witness because "Garcia was hard to confer with, period. He has an accent. Quite frankly, to get him to say anything at all was a chore. He just vacillates from position to position and won't equivocally take any position." Although Dr. Garcia subsequently testified at a post-conviction hearing on May 21, 1979, after having treated the appellant off and on for nearly four (4) years, that it was his opinion that Mr. Frazier was legally insane when he committed the crime, the record before us demonstrates that the defense attorney used due diligence in attempting to ascertain the opinion of Dr. Garcia. Trial counsel elicited testimony of a psychiatrist who saw Frazier prior to the murder and the testimony of a psychiatrist who examined him soon after the homicide; the decision to call Dr. Garcia was a strategic [3] one best left to trial counsel. See, *Davison,* supra.

---

**3.** The following testimony of Judge Green is most enlightening, and corroborates the testimony of Mr. Brown regarding attempts to ascertain the opinion of Dr. Garcia, who was also not called as a witness at trial by the State.

> JUDGE GREEN:
> In the preliminary stages of this particular case I don't recall who made the application to commit Mr. Frazier for observation; the file would be the best record for that I do know that Mr. Hopper, Mr. Brown on several occasions, including myself, would attempt

to see if we could not get more help or more medical opinions in regard to Mr. Frazier's current and past mental abilities. (PCR 5–22–79 p. 33)

> \* \* \* \* \* \*

> I don't know how we could have done any more. Now, you can look back on a case and say if you done this and this and this it may have turned out differently, but that's hindsight. . . . It was an effort that was a three-sided thing where people, except during the trial, where people worked back and forth

Further, the appellant argues that Mr. Brown's failure to timely perfect his appeal demonstrated ineffective assistance of counsel. A thorough review of the record reveals that Mr. Brown acted in a reasonably competent manner, under the peculiar circumstances presented in this case, sufficient to meet our standards in *Johnson v. State,* 620 P.2d 1311 (Okl.Cr.1980), or in *Eide v. State,* 551 P.2d 275 (Okl.Cr.1976). This assignment of error is without merit.

Accordingly, the judgment and sentence is AFFIRMED.

BRETT, P.J., and CORNISH, J., concur.

because it was a situation, other than when we tried it, where people tended to cooperate, which was the case to try to find out what the truth was. (PCR 5–22–79 p.p. 37 & 38)

\* \* \* \* \* \*

... [T]o put it bluntly, at that particular time our experience with Eastern State hospital was not the best between the courts and the handling of a criminal case.... They would send a report and say he was unable to stand trial, ... Then a week later we would get a report ... 'he's cured and ready to stand trial.' (PCR 5–22–79 p. 36).