1999 OK CR 15

**Terry Lyn SHORT, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–97–540.

Court of Criminal Appeals of Oklahoma.

April 14, 1999.

Rehearing Denied May 21, 1999.

Jim Rowan, Indigent Defense System, Norman, John Albert, Oklahoma City, Counsel for Appellant at trial.

Robert Macy, District Attorney, Fern Smith, Assistant District Attorney, Oklahoma City, OK, Counsel for the State at trial.

Matthew D. Haire, Indigent Defense System, Norman, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, Counsel for the State on appeal.

### OPINION

LUMPKIN, Vice Presiding Judge:

¶ 1 Appellant Terry Lyn Short was tried by jury and convicted of First Degree Murder (Count I) (21 O.S.1991, § 701.7) and five counts of Attempting to Kill, After Former Conviction of Two or More Felonies (Counts II—VI) (21 O.S.1991, § 652), Case No. CF–95–216, in the District Court of Oklahoma County. In Count I, the jury found the existence of three (3) aggravating circumstances and recommended the punishment of death. In Counts II—IV, the jury recommended as punishment one hundred (100) years imprisonment. In Counts V and VI, the jury recommended two (200) hundred years imprisonment. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

¶ 2 Appellant was convicted of the murder of Ken Yamamoto. Mr. Yamamoto lived in apartment number 227 at the Royal Chateau Apartments in Oklahoma City. Directly beneath that apartment, in apartment number 127 lived Tammy Gardner, her two minor children, and Brenda Gardner, Tammy's sister.

¶ 3 Brenda Gardner and Appellant had been dating for some time. Appellant was abusive to Brenda and on several occasions threatened to kill Brenda and her family. At

1. Appellant's Petition in Error was filed in this Court on October 17, 1997. Appellant's brief was filed April 29, 1998. The State's brief was filed July 28, 1998. Appellant's reply brief was filed August 17, 1998 The case was submitted to the Court August 21, 1998. Oral argument was held January 26, 1999.

approximately 3:00 a.m. on January 8, 1995, Tammy and Brenda were awakened by a banging on the front door. When Brenda called out, the noise at the door stopped. Approximately thirty (30) minutes later, Robert Hines, the father of one of Tammy's children, knocked on the front door. He was unable to enter through the door as it was jammed. Hines entered the apartment through the patio door. He repaired the front door and remained to visit with Tammy and Brenda. At approximately 5:00 a.m., Brenda looked out the patio door to see Appellant standing beside Hines' truck. Upon hearing Brenda's announcement of Appellant's presence, Hines moved towards the patio door to look out. Appellant then threw a homemade explosive through the patio door, burning Hines and the apartment. Despite the burning of his left arm, Hines was able to run out of the apartment. Tammy, Brenda and the children escaped unharmed.

¶ 4 The fire spread quickly and caused Mr. Yamamoto's apartment to collapse into the inferno beneath it. Mr. Yamamoto was asleep at the time of the fire, and awoke to find himself burned and surrounded by paramedics. Mr. Yamamoto was severely burned, suffering thermal burns to 95 percent of his body. Mr. Yamamoto was transported to the hospital where he died several hours later as a result of the burns.

¶ 5 That same evening, Appellant phoned his cousin, David Davis, and asked him to pick him up and accompany him to the police station so he could surrender. At Appellant's request, Davis took Appellant a complete change of clothing. After changing his clothes, and accompanied by Davis, Appellant surrendered to the authorities.

¶ 6 Appellant raises fifteen propositions of error in his appeal. These propositions will be addressed in the order in which they arose at trial.

## PRE–TRIAL ISSUES

 ¶ 7 Appellant challenges the trial court's determination of his competency to stand trial in his fourth assignment of error. At the time of Appellant's trial, the standard of proof to be used in competency determinations required a defendant to prove his/her incompetency by "clear and convincing" evidence. That standard has since been held unconstitutional, and "preponderance of the evidence" has been held the proper standard of proof. *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Appellant argues that since he was found competent under an unconstitutional standard of proof, his case should be reversed and remanded in order that his competence can be evaluated under the proper "preponderance of the evidence" standard.

¶ 8 Pursuant to an order of the trial court, Dr. Edith King examined Appellant in the Oklahoma County Jail. Dr. King reported: 1) Appellant was able to appreciate the nature of the charges against him; 2) he was able to consult with his lawyer and rationally assist in the preparation of his defense; 3) he was not mentally ill; and 4) if Appellant were released without treatment, therapy or training he would pose a significant threat to the life or safety of himself and others.[2] At the post-examination competency hearing, defense counsel stipulated to Dr. King's findings that Appellant understood the charges against him and could assist in his defense and that if she were called to testify her testimony would be consistent with her report. No other evidence was offered or presented. Based upon the evidence before it, the trial court found Appellant competent to stand trial.

 ¶ 9 Whether a defendant is competent to stand trial is a matter left to the sound discretion of the trial court. *Siah v. State,* 837 P.2d 485, 487 (Okl.Cr.1992). This Court can review that decision, applying the proper standard of proof, *i.e.* "preponderance of the evidence." *See Smith v. State,* 932 P.2d 521, 528 (Okl.Cr.1996), *cert. denied,* 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997). The standard of review on appeal is whether there is any competent evidence reasonably supporting the trier of fact. *Gil-*

---

**2.** This finding is not inconsistent with the other findings. It is based on Appellant's anti-social personality characteristics which could cause him to become dangerous to others and not on his competency. (O.R.175).

*bert v. State* 951 P.2d 98, 105 (Okl.Cr.1997). When the issue of competency is tried before a judge, his finding will not be disturbed on appeal if it is supported by sufficient evidence. *Id.*

¶ 10 Here, the uncontradicted evidence showed that Appellant knew the nature of the proceedings and possessed a rational understanding of them. The defense failed to prove, even by a preponderance of the evidence, that Appellant was incompetent to stand trial. Because the evidence in this case so strongly supports the finding that Appellant was competent, we find the trial court did not abuse its discretion in finding Appellant competent to stand trial, and this case need not be remanded for a new determination on the issue. Accordingly, this assignment of error is denied.

### JURY SELECTION

¶ 11 In his eleventh assignment of error, Appellant contends the State's race-neutral reasons for excusing venirepersons Smith and Frazier were pretextual and their excusal from the jury violated the Equal Protection Clause under *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986).

¶ 12 *Batson* establishes a three (3) part analysis: 1) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; and 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* As for the second requirement, the Supreme Court noted the race-neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. *Neill v. State*, 896 P.2d 537, 546 (Okl.Cr.1994), *cert. denied*, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740, (1996), quoting *Batson*, 476 U.S. at 98, n. 20, 106 S.Ct. at

1723, n. 20. The trial court's findings as to discriminatory intent are entitled to great deference. *Id.* Our review is only for clear error by the trial court, *Pennington v. State*, 913 P.2d 1356, 1365 (Okl.Cr.1995), *cert. denied*, 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996) and we review the record in the light most favorable to the trial court's ruling. *Neill*, 896 P.2d at 546.

¶ 13 A review of the record in this case shows the prosecutor offered race-neutral explanations for striking Ms. Smith and Ms. Frazier from the panel.

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.*, quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (1991). *See also Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995); *Turrentine v. State*, 965 P.2d 955, 964 (Okl.Cr.1998).

¶ 14 Here, the prosecutor used his second peremptory challenge to excuse venireperson Smith. He explained that she had a brother with two convictions and that because of the way she answered questions posed to her, the prosecutor was not sure she was being truthful. After noting that Ms. Smith was a black female, the trial court, over defense counsel's objection, accepted the prosecutor's explanation and struck the juror. The prosecutor used his last peremptory challenge to excuse venireperson Frazier stating that she had been convicted of an offense and placed on probation. He added "I don't want to gamble a verdict in this case on someone who I personally prosecuted." (Tr. II, pg.218). Again noting that the venireperson was a black female, the trial court, acknowledging its own reservations about the explanation and over defense counsel's objection, agreed to strike Ms. Frazier from the jury. (Tr. II, pg.218–220).[3]

---

**3.** The record reflects that with the excusal of Ms. Smith and Ms. Frazier, no black individuals were

¶ 15 The prosecutor's explanations were facially valid and do not reveal an intent to discriminate against the potential jurors on account of race. Excusal of a potential juror because of a prior criminal record or because of the criminal records of family members are legitimate reasons for removal. Further, these same reasons were used to excuse non-minority members of the venire, *i.e.*, a white female was excused because her husband had a prior criminal record, *albeit* approximately twenty-six years had passed since his two year incarceration. The fact that this reason, criminal records by family members, was not used in every instance in which it arose to excuse potential jurors, does not lessen its legitimacy as a race-neutral explanation.

¶ 16 Once the prosecutor offers a race-neutral basis for the exercise of the peremptory challenge, it is the duty of the trial court to determine if the defendant has established purposeful discrimination.

> [I]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.... [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'

*Turrentine*, 965 P.2d at 965, quoting *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1859, 114 L.Ed.2d at 409.

¶ 17 Here, the trial court chose to believe the prosecutor's race-neutral explanations for striking the jurors in question, rejecting Appellant's assertion that the reasons were pretextual. The trial court's decision on the issue of discriminatory intent will not be overturned unless we are convinced that the determination is clearly erroneous. *Hernandez*, 500 U.S. at 369, 111 S.Ct. at 1871–72, 114 L.Ed.2d at 412. *See also Simpson v. State*, 827 P.2d 171, 175 (Okl.Cr.1992). Apart

from the prosecutor's demeanor, which we are not able to adequately review from the written transcripts, the court could have relied on the facts that the prosecutor defended his use of the peremptory challenges without being asked to do so by the judge, that no history of the prosecutor seeking to purposefully discriminate against jurors on the basis of race was established, and that the record in this case reveals that race was simply not an issue. No allegations were made that the commission of the offense or the prosecution of Appellant were in any way racially motivated. Therefore, we find no error in the trial court's determination that the prosecutor did not discriminate on the basis of race and that Appellant failed to carry his burden of showing purposeful discrimination. This assignment of error is denied.

## FIRST STAGE ISSUES

### A.

¶ 18 In his first assignment of error, Appellant contends reversible error occurred when the trial court prohibited the defense from calling Mark Bayless as a witness. Appellant asserts Bayless was a critical witness to rebut the State's case-in-chief and that despite the failure of the defense to endorse Mr. Bayless prior to trial, exclusion of his testimony violated the constitutional compulsory process clause. Okla. Const. art. II, § 20; U.S. Const. amend. VI.

¶ 19 Prior to trial, Appellant was detained in a "holding cell" in the Oklahoma City Jail. This "holding cell" contained several people who were awaiting transportation to the county jail. In the "holding cell" at the same time as Appellant were inmates Jay Brown and Mark Bayless. Testifying in the State's case-in-chief, Brown testified that Appellant said he thought he knew Brown, a fact which Brown denied, and proceeded to tell Brown that he was in jail for firebombing an apartment complex. Brown also testified that he observed Appellant draw sexually explicit pictures of a woman on the walls of the cell.

---

left to sit on the jury. We also note for the record that Appellant is a white male. However, we recognize the *Batson* rule applies to race based exclusions even where the defendant and

the potential juror do not share the same race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

Next to the pictures, Brown saw Appellant write the words "die Brenda G", "Brenda G is a slut", and "burn Brenda G". Brown further testified that sometime later he and Appellant were talking and Appellant told him that he had dated Brenda G.; they had both been heroin addicts who stole to support their addiction; he eventually got a job at "Two Guys Auto" and he and Brenda moved into an apartment. Appellant also said that Brenda's sister, Tammy, and her boyfriend Robert Hines, moved in with them. Appellant stated that one day he came home from lunch and found Brenda having sexual intercourse with Hines; that he looked for a gun but could not find one, so he came up with the idea of putting gasoline in a Coke bottle and a sock in the top. He then went to the apartment where Brenda was living, threw the coke bottle inside, saw it hit Hines in the back of the head, shut the door and ran away.

¶ 20 Brown was the last witness presented in the State's case-in-chief. The first witness called by the defense was Mark Bayless. The State objected as Bayless was not endorsed as a witness. Acknowledging this fact, defense counsel noted that he had given the prosecutor a handwritten note three (3) days earlier stating that the defense would call Bayless as a witness. Defense counsel argued that Bayless would refute Brown's testimony concerning Appellant's confession and would testify that he observed someone other than Appellant draw the sexually explicit pictures on the jail cell wall. The trial court upheld the State's motion to prohibit the testimony finding the defense had violated the rules of discovery by failing to list Bayless as a witness. The court also found that even if called Bayless was not a crucial witness as he was not present during the conversations between Appellant and Brown and could not testify as to the content of those conversations. Defense counsel then offered Bayless as a rebuttal witness to the fact that Appellant did not draw the obscene pictures. The trial court denied the request.

¶ 21 Prior to trial, discovery motions were filed by both the prosecution and the defense. Eleven days prior to trial, the defense filed its witness list and summary of testimony. Mark Bayless was not listed as a witness. The failure of the defense to list Bayless as a witness was a violation of the Discovery Code. 22 O.S.Supp.1996, § 2001 *et. seq.* The trial courts are empowered to order the appropriate relief for the failure to comply with a discovery order. 22 O.S.Supp. 1996, § 2002(E)(2). This relief may include prohibition of a witnesses testimony. *Wilkerson v. District Court of McIntosh County,* 839 P.2d 659, 661 (Okl.Cr.1992).

¶ 22 In *Wilkerson,* this Court recognized that "few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* We also acknowledged the preclusion of material defense witnesses from testifying is the severest sanction for discovery violations, *citing Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). *Id. See also Allen v. State,* 944 P.2d 934, 937 (Okl.Cr.1997); *Wisdom v. State,* 918 P.2d 384, 396 (Okl.Cr.1996). However, preclusion of testimony is appropriate in certain circumstances. In *Wilkerson* we stated:

> When the discovery violations are flagrant, such as being designed to conceal a plan to present fabricated testimony or being willful and motivated by a desire to obtain a tactical advantage, then the preclusion sanction could be entirely appropriate and consistent with the purposes of the compulsory process clause.

> Petitioners have not established that, by imposing the sanction, Respondent has exercised power unauthorized by law or that Petitioners' remedies on appeal are not adequate and appropriate. Rule 10.6(A), supra. They have not established that their witnesses, precluded from testifying, are material or that their case has been substantially prejudiced by the discovery sanction. (citation omitted) Moreover, from the facts developed at this point in the case, this Court is unable to determine that the preclusion sanction is not appropriate. (citation omitted).

*Wilkerson,* 839 P.2d at 661. Based upon the record before us, we are unable to determine that the preclusion of Bayless's testimony was not an appropriate sanction. The preliminary hearing in this case was held ap-

proximately one year and a half prior to trial. Brown testified at the preliminary hearing and gave essentially the same testimony as he did at trial. Appellant has failed to explain why he did not notify the State about Bayless's testimony until the start of trial.

 ¶ 23 Further, Bayless was not a material witness. He was not a party to the conversations between Brown and Appellant. Therefore, he could not testify as to the truthfulness of Brown's testimony regarding Appellant's confession. At most, Bayless could impeach Brown only as to the testimony regarding who drew the pictures on the jail cell wall. Bayless was not a witness to the actual crime and therefore could not have refuted the testimony of the eyewitnesses. Because Bayless was not a material witness, and as Appellant has failed to establish that he was substantially prejudiced by the exclusion of the testimony, we find no error in the trial court's ruling.

 ¶ 24 Relying on *Spencer v. State*, 795 P.2d 1075, 1078 (Okl.Cr.1990), *Wooldridge v. State*, 659 P.2d 943, 947 (Okl.Cr.1983) and *Luna v. State*, 815 P.2d 1197, 1199 (Okl.Cr. 1991) Appellant argues that Bayless was a rebuttal witness for which no notice to the State was required. The cases cited by Appellant are wholly unavailing to his position. These cases concern the admission of testimony of witnesses for the State who had not been endorsed. In these cases, this Court found that since the evidence being rebutted had not been presented until the defendant's case-in-chief, the State could not have known that the rebuttal witness would be required and therefore was excused from the obligation of endorsing the witness, even though the witness could have been called in its case-in-chief.

¶ 25 In the present case, the defense knew from the preliminary hearing that it would need to impeach Brown's testimony. Bayless's testimony was not offered to explain any unexpected evidence from the State. It was only after Bayless was prohibited from testifying in the case-in-chief that he was offered as a rebuttal witness. Bayless was not a true rebuttal witness. He was a rebuttal witness only in as much as every defense witness is a "rebuttal" witness to the State's case. Further, under usual trial proceedings, rebuttal is an opportunity for the State to present witnesses, for whom no notice is required, to rebut the defense case-in-chief. The defense does not present rebuttal witnesses until surrebuttal. Bayless's testimony does not qualify as surrebuttal evidence. Accordingly, we find Bayless was subject to the provisions of the discovery code and the defense was not excused from providing timely notice of his testimony. This assignment of error is denied.

**B.**

 ¶ 26 In his fifth assignment of error, Appellant complains the admission of several pieces of evidence denied him a fair trial. Initially, he contends the exhibition of Robert Hines' wounds was irrelevant, inflammatory and unnecessarily prejudicial. At the conclusion of Hines' direct examination, the prosecutor asked Hines to show the jury the burns he suffered as a result of the firebombing. Defense counsel objected arguing such a demonstration was highly prejudicial and the prejudicial impact outweighed any probative value. The objection was overruled and Hines' removed his shirt revealing the burns to his arm.

 ¶ 27 Initially, Appellant has waived any claim the evidence was not relevant. When a specific objection is raised at trial, this Court will not entertain a different objection on appeal. *Mitchell v. State*, 884 P.2d 1186, 1197 (Okl.Cr.1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). Therefore, we review only the objection as to prejudice. On appeal, the burden of establishing prejudice is upon the defendant. *Woodruff v. State*, 846 P.2d 1124, 1135 (Okl.Cr.), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). In reviewing the prejudicial impact of photographs this Court has said that "[w]here the probative value of photographs or slides is outweighed by their prejudicial impact on the jury that, is the evidence tends to elicit an emotional rather than rational judgment by the jury then they should not be admitted into evidence." *President v. State*, 602 P.2d 222, 225 (Okl.Cr.1979). *See also Oxendine v. State*,

335 P.2d 940, 942 (Okl.Cr.1958). Applying that standard to this case, the demonstration of Hines' wounds was not such as to elicit an emotional rather than rational judgment from the jury. Hines was burned on the left side of his body—ear, neck and arm. Most of the scarring resulting from the burns was visible prior to Hines removing his shirt. The scarring was a direct result of Appellant's actions and probative of his intent to kill Hines and the others. The brief display of the wounds was not a mere theatrical demonstration, but helped the jury in understanding the commission of the offense. *Gilbert*, 951 P.2d at 121. Further, there is no requirement that the visual effects of a particular crime be down played by the State. *McCormick v. State*, 845 P.2d 896, 898 (Okl. Cr.1993). Here, the exhibition of Hines' wounds was probative and that probative value was not outweighed by their prejudicial impact. Appellant has failed to meet his burden of prejudice, and the display of the wounds was proper.[4]

¶ 28 Appellant next complains about the admission of items retrieved from a search of his motel room. On the day Appellant surrendered to the police, a search warrant was executed on his motel room. Recovered in the search was a yellow note pad with several diary entries concerning the state of Appellant's relationship with Brenda Gardner, an empty plastic cola bottle, two plastic cola bottle caps, one plastic cola bottle cap liner, and a full bottle of lighter fluid. The admission of the evidence drew no objection from defense counsel. Now on appeal, Appellant argues none of these items were relevant. Reviewing this claim for plain error only as the claim was not raised at trial, we find the evidence properly admitted. The diary notes were relevant in showing Appellant's intent to kill Brenda, and the other evidence, shown by other testimony to be components of a firebomb, showed Appellant's ability and opportunity to make a firebomb.

¶ 29 Further, Appellant complains about the admission into evidence of the actual search warrant and the accompanying affidavits. Again, they were admitted at trial with no objection from the defense, therefore we review only for plain error. We find the information in the affidavit and search warrant was merely cumulative to other evidence already before the jury. Appellant has failed to show that he was prejudiced by the admission of the affidavit and search warrant. We find their admission did not deny Appellant a fair trial.

¶ 30 Appellant further asserts the State failed to prove any nexus between himself and the drawings on the jail cell wall. Appellant objected to the admission of State's Exhibits 33 and 34, photographs of the drawings, on the grounds of authenticity and relevance. This objection has preserved the issue for appellate review.

¶ 31 The photographs were introduced during the testimony of Detective Easley. He identified State's Exhibits 33 and 34 as photographs he took of the drawings on the cell wall. This testimony was sufficient to authenticate the photographs. 12 O.S.1991, § 2901. As for the relevance of the photographs, Jay Brown testified that he observed Appellant write derogatory comments and threats about Brenda G. on the cell walls next to the pictures. Neither Brown nor any other witness testified to seeing the actual drawing of the pictures on the wall. Despite this fact, the drawings corroborated Brown's testimony that Appellant wrote the obscene comments and threats. Further, the fact that Appellant wrote the derogatory comments next to the pictures makes it more probable that Appellant drew the pictures. *See* 12 O.S.1991, § 2401. This probative value of the pictures was not substantially outweighed by any prejudice inherent in the

4. Appellant makes an additional argument that in showing his wounds to the jury, Hines in effect became an "exhibit" for the prosecution. He further argues the State did not memorialize for appellate review what was shown to the jury. He claims the State thereby violated Rule 2.2(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1998) and the in-court demonstration was *per se* inadmissible. The record reflects the display of Hines' wounds was not offered or marked as an exhibit by the State. Further, the display of his wounds was no different than when a witness makes an identification at trial and it is so noted in the record. Therefore, we find the demonstration was not *per se* inadmissible.

crude nature of the pictures. Accordingly, we find no error in the admission of the photographs of the drawings.

### C.

 ¶ 32 Appellant raises an additional challenge to the evidence in his sixth assignment of error. He asserts the admission of the statement by David Davis to Detective Burke that Appellant was not wearing socks when Davis picked him up and accompanied him to the police station to surrender violated his rights of confrontation as well as his right to a fair trial and a reliable sentencing. This testimony was not met with an objection. Reviewing only for plain error, we find none. When alleged hearsay is admitted without objection, the statements may be considered as though they are admissible. *Plantz v. State,* 876 P.2d 268, 279 (Okl.Cr. 1994), *cert. denied,* 513 U.S. 1163, 115 S.Ct. 1130, 130 L.Ed.2d 1091 (1995); *Davis v. State,* 451 P.2d 974, 977 (Okl.Cr.1969). Viewing the statement as properly admitted, Appellant was not denied his confrontation rights by the admission of the statement as Davis testified at trial and was subject to cross-examination. The fact that Davis could not recall whether or not he told Detective Burke about the socks does not violate the confrontation clause. *See Omalza v. State,* 911 P.2d 286, 301 (Okl.Cr.1995). *See also United States v. Owens,* 484 U.S. 554, 558, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988). Further, admission of the statement did not deny Appellant a fair trial or reliable sentencing as the statement was consistent with other evidence presented by the State: namely Brown's testimony that Appellant said he used his sock to make the wick for the firebomb, and that a complete change of clothing, except for the socks, was found in Davis's car upon Appellant's surrender. Accordingly, this assignment of error is denied.

### D.

 ¶ 33 In his tenth assignment of error, Appellant contends the trial court erred in admitting into evidence his confession. Appellant asserts the State failed to establish through substantial independent evidence the trustworthiness of the confession. We re-

view only for plain error as no objection was raised to the admission of the confession.

 ██ ¶ 34 A confession is not admissible under Oklahoma law unless it is supported by "substantial independent evidence which would tend to establish [its] trustworthiness." *Fontenot v. State,* 881 P.2d 69, 77–78 (Okl.Cr.1994), quoting *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). *See also Rogers v. State,* 890 P.2d 959, 975 (Okl.Cr.1995), *cert. denied,* 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995). This standard does not require that each material element of the charged offenses be corroborated by facts independent of the confession, or that there be no inconsistencies whatsoever between the facts proven and the facts related in the confession. *Id.* The State in the present case did provide sufficient, corroborative evidence independent of Appellant's confession to show its trustworthiness and thus its competence.

 ¶ 35 Tammy Gardner and Robert Hines testified to seeing Appellant light the firebomb and throw it through the patio door. Hines was struck and burned by the firebomb. As rescue personnel arrived at the burning apartments, Appellant was no where to be found. When Appellant finally surrendered, no socks were found among an otherwise complete change of clothes. Material necessary to make a firebomb was found in Appellant's motel room. This evidence sufficiently corroborates Appellant's confession to Brown as to render the confession trustworthy and therefore admissible.

 ¶ 36 Appellant directs our attention to certain inconsistencies between the confession and the evidence, *i.e.* no evidence of an accelerant or a firebomb was found anywhere in the Gardner apartment, the firebomb was thrown through the closed plate glass of the patio door, and Hines denied any intimate involvement with Brenda Gardner. While these inconsistencies were by no means inconsequential, we do not believe they rendered Appellant's confession untrustworthy and incompetent. Unless inconsistencies between the confession and the other evidence so overwhelm the similarities that the confession is rendered untrustworthy, it remains

within the province of the jury to determine whether the confession is credible. *Fontenot*, 881 P.2d at 79. After reviewing Appellant's confession, the independent corroborative evidence and the alleged inconsistencies, we find that his confession was trustworthy. Accordingly, it was competent evidence for the jury to consider and we find no error in its admission. This assignment of error is denied.

### E.

¶ 37 In his twelfth assignment of error, Appellant contends the trial court erred in admitting evidence that several months before the apartment fire, he had threatened to throw gasoline on and burn Marjorie Long, Brenda Gardner's mother. Appellant calls this evidence other crimes evidence for which no notice was given and for which no exception exists. He further argues that any relevance the evidence may have had was substantially outweighed by its prejudicial nature.

¶ 38 To support its theory that Appellant attempted to kill Hines, Brenda Gardner and her family, the State presented evidence of the tumultuous relationship between Appellant and Gardner. This evidence included Appellant's threats to harm Brenda and her family; the threat that "heads would roll" as a result of Brenda refusing to take full responsibility for their joint shoplifting charge; his threat to Janet Gardner, Brenda's sister, that Brenda had better meet him at a certain time and place or "something bad was going to happen"; Brenda's fear that Appellant would beat her up; and the threat made to Keith Partain by Appellant that although he only had twenty cents, he was going to buy a bottle full of gasoline to make a firebomb so he could burn up Brenda and her family.

¶ 39 In addition to this evidence, the State also offered the testimony of Marjorie Long that Appellant forced her car from the road in an attempt to get Brenda out of Long's car and into his car. Long testified that Appellant threw rocks at her car and tried to run her off the road. He eventually forced them to pull into a restaurant parking lot and told Brenda to get out of the car. When she refused, Appellant threatened to "get some gas and pour it on your mother and set her on fire." Defense counsel objected to this testimony on the basis that the trial court had previously ruled that no evidence of threats to anyone other than Brenda Gardner was admissible. After an *in-camera* discussion, the trial court explained that in its previous ruling, the court had held inadmissible evidence of threats made by Appellant to his ex-wife and other women he had been involved with before Brenda Gardner. The trial court further explained that the threats to throw gasoline on and burn Mrs. Long were not included in the above ruling as that threat was directed at Brenda Gardner, not Mrs. Long or any other third party.

¶ 40 The evidence of Appellant's threat to burn Mrs. Long was included in the State's Notice of Intent to Use Evidence of Other Crimes or Bad Acts. (O.R.340). The evidence of Appellant's prior threats toward Brenda Gardner and her family was relevant to prove Appellant's motive and intent to firebomb the apartment where Brenda lived. Evidence of previous altercations between spouses is relevant to the issue of intent. *Hooker v. State*, 887 P.2d 1351, 1359 (Okl.Cr. 1994). Although Appellant and Brenda were not husband and wife, in light of their close relationship the evidence was properly admitted pursuant 12 O.S.1991, § 2404(B) and its probative value outweighed any prejudicial effect. This assignment of error is denied.

### FIRST STAGE JURY INSTRUCTIONS

#### A.

¶ 41 Appellant contends in his third assignment of error that his due process rights were violated when the trial court failed to properly instruct the jury on the intent element of attempting to kill. Specifically, he argues: 1) the doctrine of transferred intent does not apply to attempt crimes; 2) Instruction No. 11 contained inconsistent and confusing language, and contradicted Instruction No. 10; and 3) the combined effect of Instructions No. 10 and 11 removed the State's

burden of proof on an essential element of the offense.

¶ 42 Jury Instruction No. 10 provided:

In Counts 2, 3, 4, 5 and 6 the defendant is charged with the crime of Attempt to Kill Another, on or about the 8th day of January 1995, in Oklahoma County, Oklahoma.

No person may be convicted of an attempt to kill another unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* an attempt to kill;

*Second,* another person;

*Third,* by performing an act;

*Fourth,* with the intent to cause or belief that it would cause death.

(O.R.991). This instruction tracks the language of Instruction No. 4–8, OUJI–CR (2d). Instruction No. 11 provided:

If you find that the defendant intended to kill any of the named victims, those being: Brenda Gardner, Robert Hines, Tammy Gardner, Chase Hacket or Robert Gardner, and by mistake or accident injured or assaulted any one of the named victims, the element of intent is satisfied even though the defendant did not intend to kill any one of the victims. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

(O.R.992). This instruction tracks the language of Instruction No. 4–11, OUJI–CR (2d).

¶ 43 Appellant objected to Instruction No. 11 at trial arguing that it was a misstatement of the law. Appellant further argued "[b]ut when you have the charge of assault and battery with intent to kill, then there must be a specific intent to kill an individual. And I don't believe, Your Honor, that they can clothe that in general terms that intent to kill any is intent to kill all." (Tr. V, 81). The trial court overruled this argument finding the instruction a proper statement of the law.

¶ 44 Under the doctrine of transferred intent when one person acts with intent to harm another person, but because of a bad aim he instead harms a third person

who he did not intend to harm, the law considers him just as guilty as if he had actually harmed the intended victim. W.LaFave and A. Scott, *Criminal Law,* § 3.12(d) (2nd ed.1986). This Court has not specifically ruled on whether this doctrine applies in attempt crimes, *i.e.,* situations where there is no injury to any unintended victim. However, we have applied the law of transferred intent in a case of assault with a dangerous weapon, despite the lack of any injury to an unintended victim. *Jones v. State,* 508 P.2d 280, 282 (Okl.Cr.1973). In the present case, when Appellant intended to cause, or believed that the firebombing would cause the death of one or more of the inhabitants of Apartment 127, then through his act of attempting to kill any of those inhabitants by throwing the firebomb at the apartment, he committed the offense of attempt to kill as to any other persons assaulted by mistake or accident. Therefore, we find the doctrine of transferred intent applies in the present case.

¶ 45 In this case, there were multiple victims of the attempt to kill charges. In Instruction No. 11, the trial court attempted to comply with the uniform jury instruction by listing the names all of those individuals in the apartment at the time of the firebombing as intended victims and using the reference "any one of the named victims" for the reference to the actual victims. At first glance, this instruction is confusing as it seems to list the same individuals as intended victims and actual victims. However, when the instruction is read in its entirety it is clear that the list of intended victims is set forth in the disjunctive. Further, the last sentence of the instruction distinguishes between "the original intended victim" and "the actual victim." Therefore, the instruction reads that if the jury found Appellant intended to kill any of those persons inside the apartment, those persons being Brenda Gardner, Robert Hines, Tammy Gardner, Chase Hacket **or** Robert Gardner, and by mistake or accident injured or assaulted Brenda Gardner, Robert Hines, Tammy Gardner, Chase Hacket **or** Robert Gardner, the element of intent is satisfied even though Appellant did not intend to kill any one of the

actual victims. Contrary to Appellant's argument, a rational juror would not have read the instruction as transferring intent from, for example Robert Hines to Robert Hines. The instruction, while it could have been more clear based on the facts of this case, adequately distinguished the intended victim from the actual victim.

¶ 46 Further, Instruction No. 11 did not negate the intent element set forth in Instruction No. 10. The burden of proof set forth in Instruction No. 10 was that the act was performed with the intent or belief that the act would cause death to another person. Instruction No. 11 merely provided the intent to kill as to one person is sufficient to convict as to another person actually harmed. The burden of proof was not diminished by Instruction 11. Nor was an element of the offense negated by applying the burden of proof set out in Instruction No. 10 to the harm caused to a third person who was the actual victim of Appellant's proven intent.

¶ 47 Having thoroughly reviewed Appellant's challenges to Instructions No. 10 and 11, we find no errors warranting reversal. This assignment of error is denied.

### B.

¶ 48 In his thirteenth assignment of error, Appellant contends the trial court erred in failing to give a jury instruction, *sua sponte*, requiring corroboration of his confession. We review only for plain error as no such instruction was requested nor was an objection raised to the absence of the instruction. We agree the trial court erred in failing to give an instruction requiring corroboration of the confession by independent evidence. *Shelton v. State*, 793 P.2d 866, 876 (Okl.Cr.1990). However, the failure to give such an instruction is not grounds for reversal when the record contains corroborating evidence. *Id.* As discussed above, the record in this case contained ample evidence corroborating the confession. Therefore, we find reversal is not warranted by the absence of the instruction.

¶ 49 Appellant also contends the trial court failed to give an instruction, *sua sponte*, on the need for corroboration of

Brown's informant testimony. Once again we review only for plain error as no such instruction was requested nor was an objection raised to the absence of the instruction.

¶ 50 The decision to give a cautionary instruction is more often discretionary than it is fundamental. *Wilson v. State*, 756 P.2d 1240, 1243–44 (Okl.Cr.1988). Here, we find the trial court did not abuse its discretion in failing to give such an instruction. Substantial evidence, other than Brown's testimony, placed Appellant at the scene of the crime. *Cf. Smith v. State*, 485 P.2d 771, 773 (Okl.Cr.1971) (failure to give cautionary instruction on informant's testimony reversible error as informant's testimony was only evidence which placed defendant at the scene of the crime). Further, the jury was generally instructed on the weight and credibility to be accorded the witnesses' testimony. (O.R.1001). Accordingly, we find the absence of a cautionary instruction on informant testimony did not deny Appellant a fair trial, and this assignment of error is denied.

### *SECOND STAGE ISSUES*

#### A.

¶ 51 In his second assignment of error, Appellant argues the victim impact evidence introduced in this case violated the rules of evidence and his rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution. Specifically, he asserts: 1) the testimony of Kiyoka Yamamoto far exceeded the scope of permissible victim impact evidence; 2) the admission of a live picture of the victim was error; 3) the admission of a newspaper article about the victim was hearsay and outside the scope of permissible victim impact evidence; 4) the victim impact evidence in this case violated Appellant's right to due process, a reliable sentencing proceeding and confrontation; and 5) victim impact evidence has no place in Oklahoma's sentencing scheme.

¶ 52 Victim impact evidence is constitutionally acceptable unless "it is so unduly prejudicial that it renders the trial funda-

mentally unfair." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991). In *Cargle v. State,* 909 P.2d 806, 827–28 (Okl.Cr.1995) we set out the basis the United States Supreme Court utilized to find the Eighth Amendment is not violated by victim impact evidence and that the Fourteenth Amendment has the potential to be implicated if appropriate restrictions are not placed on victim impact evidence.

¶ 53 This Court has held victim impact evidence admissible as long as it is "restricted to the 'financial, emotional, psychological, and physical effects,' or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim." *Ledbetter v. State,* 933 P.2d 880, 889–90 (Okl. Cr.1997).

> The statutory language [22 O.S.Supp.1993, § 984] is clear the evidence should be restricted to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim. (cite omitted). So long as these personal characteristics show how the loss of the victim will financially, emotionally, psychologically, or physically impact on those affected, it is relevant, as it gives the jury "a glimpse of the life" which a defendant "chose to extinguish," (cite omitted). However, these personal characteristics should constitute a "quick" glimpse, (cite omitted), and its use should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed.

*Cargle,* 909 P.2d at 828.

¶ 54 In the present case, the State filed a Notice of Victim Impact Statement. The author of the statement was Kiyoka Yamamoto, the victim's mother. Mrs. Yamamoto was the last witness called for the State in the penalty phase of trial. Prior to her testimony, the trial court noted it had read Mrs. Yamamoto's statement and found it to be in conformity with *Cargle.* The court was informed that Mrs. Yamamoto, a Japanese citizen, would read her statement in Japanese then it would be translated into English by an interpreter. Defense counsel agreed to the procedure and noted that the defense had had a copy of Mrs. Yamamoto's statement for awhile and agreed that it substantially complied with the law. Mrs. Yamamoto's statement, which comprised approximately six pages in the trial transcript, told how she had received a telephone call at her home in Kyoto, Japan, telling her of her son's injuries and that she immediately flew to Oklahoma City to be with him. Mrs. Yamamoto said the victim was her only child that she had raised by herself. She described her ill health over the last fifteen years and that she had battled her illness for her son's sake. She described how when her health was stabilized, her son told her he wanted to go to America and study. Putting aside her own fears, she agreed to let her son go to America. Mrs. Yamamoto said her son was an excellent student and received many awards. She said he wanted to stay in America and study but worried about his ailing mother. Mrs. Yamamoto said she and her son talked on the telephone every two or three days and he came to Kyoto every summer to check on her health.

¶ 55 Mrs. Yamamoto also stated that approximately one week before her son was killed he told her that if anything happened to him, to bury him in Oklahoma. She described her last conversation with her son wherein he told her his downstairs neighbors were very noisy and made it difficult for him to study. Fourteen hours after that conversation, she received word that her son had been injured and had only approximately fifteen hours to live. Stating that she "could not understand why this was going on … my heart was screaming, why, why, why … [m]y head was hit by big hammer." She said that all she could think to do was to get an airplane ticket. She said that reservations were made for her and she left immediately. "The airplane was so slow. I couldn't eat or sleep. I could only pray to God not to take my healthy young man's life." When she arrived in Oklahoma City, Mrs. Yamamoto rushed to the hospital and found her son burned over 98 percent of his body. She said she believed her son heard her voice, that he tried to move his head and shortly thereafter passed away.

¶ 56 Mrs. Yamamoto said that her son had been told by Mrs. Tohgi, the person who had made the phone call to Mrs. Yamamoto and made her flight arrangements, that his mother was on the way. She said her son squeezed Mrs. Tohgi's hand as tears ran down his cheeks. Mrs. Yamamoto said that after she talked with her son his condition changed quickly, and she believed that after he heard her voice he quit fighting and seemed to be telling her "I waited for you, ... I'm glad to hear your voice, ... please let me rest." Mrs. Yamamoto closed with noting it had been two years and three months since her son was killed and that his death had greatly affected her health. She said she had been hospitalized many times for heart problems since his death. She added that anytime she sees fires, bombs or emergencies on television, memories of her son's death return causing her tremendous stress.

¶ 57 It was not until the close of Mrs. Yamamoto's testimony that defense counsel objected to the victim impact evidence and requested a mistrial. Defense counsel argued that Mrs. Yamamoto was very emotional and that he did not realize how emotional the evidence would be prior to it being presented at trial. The trial court admitted the evidence was emotional, noting that the witness cried and that she was permitted a few minutes to regain her composure. The court noted however that the witness got through her testimony, and that it was still of the opinion the evidence was proper under *Cargle*. The request for a mistrial was overruled.

¶ 58 The victim impact evidence in this case comes very close to weighting the scales too far on the side of the prosecution by so intensely focusing on the emotional impact of the victim's loss. *Id* at 826. However, as we stated in *Cargle*,

> In discussing this, we in no way hold the emotional impact of a victim's loss is irrelevant or inadmissible; we simply state that, in admitting evidence of emotional impact,

especially to the exclusion of the other factors, a trial court runs a much greater risk of having its decision questioned on appeal.... The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a "reasoned moral response" to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process.(citation omitted).

909 P.2d at 830.

¶ 59 Mrs. Yamamoto's statements concerning her feelings and actions upon learning of her son's injury and subsequent death were emotional, but fell within the guidelines set forth in *Cargle* and § 984. These statements were probative of the emotional, psychological, and physical effects she experienced as a result of the death of her only child. Mrs. Yamamoto's statements concerning her son's desire to study in America, his eventual achievement of that goal and his concern for his mother provided a brief glimpse of the unique characteristics of the individual known as Ken Yamamoto. While her statements concerning her fifteen year illness, her son's wish to be buried, in Oklahoma City, and her son's death bed thoughts upon seeing his mother were not relevant victim impact evidence,[5] their admission did not prevent the jury from fulfilling its function in the second stage of trial. While a portion of the victim impact testimony was very emotional, taken as a whole, the testimony is within the bounds of admissible evidence, and its focus on emotion did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. *Hooper v. State*, 947 P.2d 1090, 1105 (Okl.Cr.1997).

¶ 60 At the close of Mrs. Yamamoto's testimony, the State introduced a pre-mortem photograph of the victim. Defense counsel's objection to the photograph was overruled. This Court has held such photo-

---

5. Appellant challenges the admissibility of Mrs. Yamamoto's statements concerning her son's death bed thoughts and wishes for burial on the grounds of hearsay. We do not reach this issue as we find such statements were not probative of the financial, emotional, psychological, and physical effects, or impact, of the crime itself on the victim's survivors or personal characteristics of the victim. *Cargle*, 909 P.2d at 828.

graphs are generally inadmissible, again based on their relevancy to the issues presented at trial. *Cargle*, 909 P.2d at 830. We see no reason to retreat from that ruling. The photograph was clearly irrelevant as it in no way showed the financial, psychological or physical impact on the survivors or any particular information about the victim. The photograph did not demonstrate any "information about the victim" and it does not show how his death affected or might affect the survivors. However, this error is subject to the harmless error analysis. *Id.* at 835. *See also Darks v. State*, 954 P.2d 152, 164 (Okl.Cr.1998). In light of our following discussion that sufficient evidence to support the aggravating circumstances was presented and the evidence in support of said circumstances outweighed the mitigating evidence, the error in admitting the pre-mortem photograph is harmless beyond a reasonable doubt.

¶ 61 The State also admitted an article from the Oklahoma City University campus newspaper concerning the victim and his achievements at the university as an art student. This exhibit, State's Exhibit No. 81, was admitted by stipulation. As counsel did not raise any objection to the exhibit at trial, he has waived all but plain error review. *Simpson v. State*, 876 P.2d 690, 698–99 (Okl. Cr.1994). We find no plain error in the admission of the newspaper article as it did not impact the foundation of the case or take from Appellant a right essential to his defense. *Id.*[6]

¶ 62 Finally, Appellant argues that victim impact evidence has no place in Oklahoma's death penalty scheme as our statutes require a balancing test of aggravating circumstances and mitigation and victim impact evidence is relevant to neither. He argues that victim impact evidence operates as irrelevant, improper, highly charged, emotional evidence which is present in every capital case and has the same effect as an unconstitutionally broad aggravating circumstance or "superaggravator." This argument has been repeatedly rejected by this Court. *Cargle*, 909 P.2d at 824–30. *See also Conover v. State*, 933 P.2d 904, 922 (Okl.Cr.1997); *Smith*, 932 P.2d at 537. Appellant has not persuaded us to reconsider the issue.

¶ 63 Having reviewed Appellant's allegations concerning victim impact evidence, we find he was not denied a reliable sentencing proceeding by the admission of the victim impact evidence. Accordingly, this assignment of error is denied.

**B.**

¶ 64 In his ninth assignment of error, Appellant contends he was denied a fair sentencing proceeding by the admission of evidence supporting the "continuing threat" aggravator. During the second stage of trial, the State introduced victim protection orders from three different women issued against Appellant. Appellant filed a motion *in limine* to prohibit their admission arguing that the documents were filled with hearsay and were only used to bolster the witnesses' testimony. The trial court overruled the objection, finding that as long as the sponsoring witness testified the orders were properly admissible. Appellant did not renew his objection when the exhibits were offered into evidence.

¶ 65 A ruling on a motion *in limine* is merely advisory and not conclusive. To properly preserve the issue contained in such a motion, the proposition must be introduced at trial, and if overruled, objections

---

6. Contained in the newspaper article were comments by friends and professors of the victim describing the victim's accomplishments and personal characteristics. Title 22 O.S.Supp. 1993, § 984.1 restricts those who may give victim impact evidence to members of the victim's family or someone designated by the family. Section 984.1 states in pertinent part:

A. Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement

or appear personally at the sentence proceeding and present the statements orally....

Title 22 O.S.Supp.1993, § 984 defines members of the immediate family as "spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim." None of the individuals interviewed in the newspaper article met the above criteria. However, it is not necessary for us to address the merits of the content of the newspaper article as defense counsel's stipulation to its admission makes any error in its admission harmless.

should occur at that time. *Conover,* 933 P.2d at 912. Appellant's failure to object to the admission of the exhibits when they were offered waives all but plain error. We find no plain error.

¶ 66 Appellant further argues the testimony of witness Troi Billy far exceeded the scope of the More Definite and Certain Statement of Allegations Set Forth in the Bill of Particulars. In that pleading the State notified the defense of Troi Lyn Billy's testimony in support of the "continuing threat" aggravating circumstance. In the notice the prosecution stated:

> Troi Lyn Billy will testify that in July 1991, the defendant threatened to kill her and her children. She filed police reports in Case Numbers 9102458, 9102407, 9102474, 9102466 and 9102694. In August of 1991, she filed for a Victim Protective Order. On July 29, 1991, the defendant pointed a gun at her, her children and Susan Short and threatened to kill them. On August 9, 1991, defendant telephoned Ms. Billy and told her "it's time to die for real now, bitch." On July 13, 1991, Short telephoned Ms. Billy and told her "your fucking ass is dead."

(O.R.472).

¶ 67 Appellant now complains that Billy's testimony exceeded the notice when she testified: 1) her house had been burglarized and when she confronted Appellant he said "I told you I'm going to get you"; and 2) Appellant once told her he would cut her head off and "rape her in the ass."

¶ 68 As to testimony concerning the burglary, Appellant's only objection at trial was on the grounds of a leading question. By objecting on that ground alone, he waived all other grounds, including lack of notice. *Mitchell,* 884 P.2d at 1197. As for the testimony concerning the rape threat, Appellant did object on grounds of lack of notice but not until after Ms. Billy had testi-

fied. This Court remains committed to the general rule that a timely objection must be made on the record to preserve any alleged error for appellate review. *Wood v. State,* 748 P.2d 523, 525 (Okl.Cr.1987). A timely objection brings the alleged error to the attention of the trial court and provides an opportunity to correct the error at trial. *Davis v. State,* 753 P.2d 388, 392 (Okl.Cr. 1988). Reviewing only for plain error, we find none. The police reports concerning each incident testified to by Ms. Billy and referenced in the More Definite and Certain Statement had been provided to the defense. This was sufficient notice of the State's intent to use evidence of the burglary and rape threat to support the "continuing threat" aggravator. As such, Ms. Billy's testimony did not exceed the scope of the More Definite and Certain Statement. This assignment of error is denied.

## C.

¶ 69 In his fourteenth assignment of error, Appellant contends that all three aggravating circumstances found by the jury failed to perform the narrowing function required by the Eighth and Fourteenth Amendments to the United States Constitution and by Art. II, §§ 7 and 9, of the Oklahoma Constitution. Appellant recognizes this Court has previously rejected attacks on the constitutionality of these aggravators, but asks us to reconsider our decisions. We are not persuaded to alter our prior positions. Therefore, Appellant's argument is denied as it pertains to the constitutionality of the aggravating circumstances of "continuing threat" (*See Hamilton v. State,* 937 P.2d 1001, 1012 (Okl.Cr. 1997)); "great risk of death" (*See Id.*), and "especially heinous, atrocious or cruel." (*See Id.*).

¶ 70 Appellant also challenges the use of Instruction No. 4–74, OUJI–CR (2d).[7]

---

7. OUJI–CR 4–74 provides:
 The State has alleged that there exists a probability that the defendant will commit future acts of violence that constitute a continuing threat to society. This aggravating circumstance is not established unless the State proved beyond a reasonable doubt:

 *First,* that the defendant's behavior has demonstrated a threat to society; and
 *Second,* a probability that this threat will continue to exist in the future.

He contends that instead of limiting the aggravating circumstance of "continuing threat", the instruction actually broadens its application by leaving out any reference to violence. A review of the instruction does not support Appellant's argument. The first paragraph of the instruction explicitly refers to the allegation that there exists a probability that the defendant will commit future acts of violence. That the subsequently listed two criteria which must be proven do not mention violence does not negate the burden on the State to prove a probability that the defendant will commit future acts of violence that constitute a continuing threat to society as listed in the first paragraph. Reading the instruction in its entirety, it is clear the State had the burden of proving the defendant had a history of criminal conduct that would likely continue in the future and that such conduct would constitute a continuing threat to society. Accordingly, we reject Appellant's challenge to Instruction No. 4–74, OUJI–CR (2d). This assignment of error is therefore denied.

## ISSUES RELEVANT TO BOTH STAGES OF TRIAL PROSECUTORIAL MISCONDUCT

■■■ ¶ 71 In his seventh assignment of error, Appellant contends that prosecutorial misconduct in both stages of trial so infected the proceedings with unfairness as to deny his constitutional right to a fair trial and reliable sentencing. Appellant cites to numerous instances during both stages of trial in which he contends the prosecutors exceeded the bounds of proper prosecutorial advocacy. Initially, Appellant claims that in the first stage closing arguments, the prosecutors: 1) indicated they knew things that the jury did not; 2) misstated the evidence; and 3) referred to facts not before the jury and to evidence which had been excluded during trial. None of these comments were met with an objection at trial. Therefore all but plain error has been waived. *Freeman v. State*, 876 P.2d 283, 287 (Okl.Cr.), *cert. denied*, 513 .U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994).

¶ 72 Reading the entire closing argument in context, the complained of comments were within the wide latitude of discussion permitted both the state and the defense in closing argument. Any misstatements were not so egregious as to have risen to the level of reversible error. *Carol v. State*, 756 P.2d 614, 617 (Okl.Cr.1988).

■■■ ¶ 73 Appellant also asserts the prosecution allowed Jay Brown to misrepresent his plea agreement with the State. Appellant argues that what Brown got in return for his testimony against Appellant was essential in determining his credibility and that leaving the jury with a false impression of the terms of the plea agreement violated due process. *See Binsz v. State*, 675 P.2d 448, 450–51 (Okl.Cr.1984). Brown testified on direct examination that in exchange for his truthful testimony against Appellant, his cooperation with the authorities in other drug cases, truthful testimony against his co-defendant, successful completion of a drug recovery program and a two week after-care program, and counseling two to three times a week, he would receive a five year deferred sentence. On cross-examination, Brown was asked about the meaning of a deferred sentence. Brown insisted that even if he successfully completed all of the above requirements he would still have a conviction on his record, though "it won't be on my record as long as I don't get in trouble again."

¶ 74 The plea agreement with Brown indicated that upon successful completion of the above mentioned requirements and probationary period, he was to receive a five year deferred judgment. (State's Exhibit 79). Under Oklahoma law, no conviction results after the successful completion of the probationary period. 22 O.S.1991, § 991(c). Although Brown may not have used the correct terminology in describing the plea agreement, he clearly testified that in return for his cooperation and successful completion of the probationary period, he would no longer have a conviction on his record. No false impressions of the terms of the plea agreement were left with the jury.

■■■ ¶ 75 Turning to the second stage of trial, Appellant reiterates his complaints about the victim impact evidence raised in Proposition II and asserts that as the prose-

cutors in this case participated in the trial of *Cargle v. State*, the manner in which the prosecutors presented the victim impact evidence in this case was indicative of bad faith and disrespect for this Court. As discussed previously, the majority of the victim impact evidence was properly admitted. We find nothing in the record to support Appellant's claims of bad faith and disrespect for this Court on the part of the prosecutors. This allegation is denied.

¶ 76 Appellant further argues the prosecutors improperly: 1) stated that Appellant needed to go to death row for what he did to the victim's mother; 2) stated that the State does not seek the death penalty in every case; 3) transformed Appellant's mitigation evidence into evidence supporting the death penalty; 4) injected their personal sense of justice into the sentencing proceeding; and 5) commented on Appellant's decision not to testify at trial. None of these comments were met with an objection at trial. Therefore all but plain error has been waived. *Freeman*, 876 P.2d at 287.

¶ 77 Reviewing the complained of comments in context, we find the comments were properly based in the law and were reasonable inferences on the evidence. Any misstatements did not deny Appellant a fair trial. Addressing specifically the prosecutor's comments on the mitigating evidence, we find the jury was not encouraged to ignore the mitigating evidence. Therefore, Appellant's reliance on *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) is misplaced. Here, the prosecutor simply argued the evidence presented in mitigation was not persuasive. We find no error in the prosecution's attempt to minimize the effect of the evidence presented by the defense. *Hamilton*, 937 P.2d at 1010–11. Further, the jury was thoroughly instructed as to the mitigating evidence. The prosecutors' comments did not prevent the jury from fully considering the evidence presented in mitigation.

¶ 78 Two other challenged comments warrant our specific attention. Appellant as-serts that by arguing that no remorse had been shown, the prosecutor improperly commented on Appellant's failure to testify. We find no error in this comment as we have repeatedly held that "[b]efore a purported comment at trial on a defendant's failure to testify will constitute reversible error, the comment must directly and unequivocally call attention to that fact." *Gilbert*, 951 P.2d at 120; *Hampton v. State*, 757 P.2d 1343, 1346 (Okl.Cr.1988). The comment here did not directly call attention to the fact that Appellant did not testify, rather the comment was properly based upon Appellant's demeanor in the courtroom.

¶ 79 However, the prosecutor did comment that it was not justice to allow the defendant three meals a day, a clean place to sleep, and visits by his friends while the victim's mother daily grieves for her only son. This type of argument has been repeatedly condemned by this Court. *Le v. State*, 947 P.2d 535, 554 (Okl.Cr.1997); *Duckett v. State*, 919 P.2d 7, 19, (Okl.Cr.1995). However, under the evidence in this case, we cannot find the comments affected the sentence.

¶ 80 "Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such [as] to deprive the defendant of a fair trial." *Duckett*, 919 P.2d at 19. Because we do not find the cumulative effect of any inappropriate comments deprived Appellant of a fair trial, this assignment of error is denied.

### INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 81 Appellant contends in his eighth assignment of error that he was denied a fair trial and reliable sentencing proceeding by the ineffective assistance of counsel. Specifically, he contends counsel was ineffective for: 1) failing to promptly notify the State of a defense witness; 2) failing to object to hearsay and other patently inadmissible evidence; 3) failing to request instructions regarding uncorroborated confessions and the reliability of informant testimony; 4) conceding guilt and abandoning the entire defense theory in

closing argument; and 5) failing to object to improperly admitted victim impact evidence.

 ¶ 82 An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 688–89, 104 S.Ct. at 2065.

 ¶ 83 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id.* at 697, 104 S.Ct. at 2069. Concerning the prejudice prong, the Supreme Court, in interpreting *Strickland*, has held:

[An appellant] alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S., at 687, 104 S.Ct., at 2064; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *Nix v. Whiteside*, supra, 475 U.S. [157], at 175, 106 S.Ct. [988], at 998[, 89 L.Ed.2d 123 (1986) ]. Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding

was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. *See* [*United States v.*] *Cronic*, supra, 466 U.S. [648], at 658, 104 S.Ct. [2039], at 2046[ 80 L.Ed.2d 657 (1984) ].

*Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993) (footnote omitted). Although we must consider the totality of the evidence which was before the factfinder, our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069; *Fisher v. State*, 736 P.2d 1003, 1012 (Okl.Cr.1987).

 ¶ 84 Turning to Appellant's specific allegations of ineffectiveness, he first finds counsel ineffective for failing to promptly notify the State of the testimony of Mark Bayless. Appellant has failed to show any prejudice from counsel's conduct. As discussed in Proposition I, Bayless was not a material witness. His testimony could only serve to impeach the testimony of Jay Brown. The jury was adequately instructed on the weight to be accorded Brown's testimony. Consequently, we find counsel's failure to promptly notify the State of Bayless's testimony was not indicative of ineffective assistance of counsel.

 ¶ 85 In complaining that counsel was ineffective for failing to object to hearsay and other inadmissible evidence Appellant directs us to Propositions V and VI. He argues that the evidence discussed in those propositions of error should have drawn objections from defense counsel and that counsel's failure to so object was indicative of ineffective assistance. While failure to object may rise to the level of ineffective assistance of counsel, such a failure often will not be conclusive. Where objections that might have been raised would have been properly overruled and those that might have been sustained would have amounted to at most harmless error had the ruling been incorrect, Appellant has failed to show that any errors

by counsel were so great as to render the results of the trial unreliable. Here, the evidence discussed in Propositions V and VI was found to be either properly admitted or harmless error. Therefore, counsel cannot be found ineffective for failing to offer objections to the evidence.

¶ 86 In his thirteenth assignment of error, Appellant argued and we found error in the trial court's failure to *sua sponte* give instructions regarding corroboration of the confession and the reliability of informant testimony. Appellant now argues trial counsel was ineffective for failing to request either instruction. As discussed in Proposition XIII, where there is ample corroboration in the record, as in this case, the failure to give an instruction on the need for corroborating evidence is harmless error. Further, we found the failure to give a cautionary instruction on informant testimony did not prejudice Appellant. Therefore, counsel's failure to request these instructions did not render the result of the sentencing proceeding unreliable. *See Workman v. State*, 824 P.2d 378, 383 (Okl.Cr.1991).

¶ 87 Appellant next finds counsel ineffective for abandoning the theory that the fire was a result of a methamphetamine lab explosion. During trial, Appellant presented the case that the fire in apartment 127 was the result of the explosion of a methamphetamine lab and not the result of a firebomb. He also challenged any identification of himself as the person responsible for throwing a firebomb into the apartment. In closing argument, defense counsel rejected the theory that the fire was the result of a methamphetamine lab explosion stating that such a possibility had to be rejected. He then focused his argument on the State's failure to establish, beyond a reasonable doubt, that Appellant was the person who threw the firebomb into the apartment. The legal argument to be made is a matter of trial strategy. *See Smith v. State*, 650 P.2d 904, 908 (Okl.Cr. 1982). This Court refuses to second guess trial strategy on appeal. *Id.*

¶ 88 Further, Appellant's characterization that this change in strategy was a concession of guilt is not borne out by the record. Counsel vigorously argued that the State had failed to establish guilt beyond a reasonable doubt and repeatedly pointed out to the jury shortcomings in the State's case. In light of his challenges throughout trial to any identification of Appellant as the perpetrator of this crime, and in light of the substantial evidence against Appellant, counsel's decision to pursue a more viable theory of defense than that initially proffered was not indicative of ineffective assistance and did not render the result of the trial unreliable.

¶ 89 Finally, Appellant finds error in counsel's failure to object to the victim impact evidence. As discussed in Proposition II, counsel did object to the admission of the pre-mortem photograph of the victim. Although he did fail to offer a timely objection to the victim impact statement of Mrs. Yamamoto, finding such evidence properly admitted we cannot find counsel ineffective for failing to object. As for the newspaper article, counsel's stipulation to its admission was sound trial strategy to minimize the effect of the portions of that evidence which might have been admissible through live witnesses.

¶ 90 Having thoroughly reviewed the record, and all of Appellant's allegations of ineffectiveness, we have considered counsel's challenged conduct on the facts of the case as viewed at the time and have asked if the conduct was professionally unreasonable and, if so, whether the error affected the jury's judgment. *Le*, 947 P.2d at 556. In that light, we find that certain omissions and errors were made by trial counsel. In determining whether these errors or omissions were outside the wide range of professionally competent assistance, we consider whether counsel fulfilled the function of making the adversarial testing process work. *Id.* As our ultimate focus must be on the fundamental fairness of the trial, we find that Appellant has failed to rebut the strong presumption that counsel's conduct was professionally reasonable and that he has failed to show that he was denied a fundamentally fair trial. Accordingly, this assignment of error is denied.

¶ 91 Filed with the direct appeal is an Application for Evidentiary Hearing on

Sixth Amendment Claim and Motion to Supplement, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (1998). Appellant asserts in the Application that counsel was ineffective in failing to investigate and utilize available mitigating evidence. Attached to the Application are three affidavits. In the first affidavit, Dr. Ray Hand, Ph.D. and a licensed health service psychologist, states that at the request of appellate counsel, he conducted a psychological assessment of Appellant. The assessment was conducted on March 27, 1998, a little over three (3) years after the offenses in this case were committed. In his seven page affidavit, Dr. Hand set forth the evaluation techniques and records utilized in his assessment and a summary of his findings. Dr. Hand concluded "[i]n the case of Terry Lyn Short a complex set of factors combined to create adversity and disability in an individual with circumscribed familial, economic, educational and social opportunities." (Exhibit A).

¶ 92 In the second affidavit Troy L. Hexemer, Appellant's aunt, stated she had contact with Appellant from his birth until he was approximately eight or nine years old. Ms. Hexemer described Appellant's early life as one of neglect and abuse. She stated that she was available to testify in Appellant's trial, but was never contacted to do so. (Exhibit B). The third affidavit is from Michael L. Johns, an investigator in the Capital Direct Appeal Division of the Oklahoma Indigent Defense System. Mr. Johns stated that he had made repeated attempts to obtain copies of the Federal Prison Records on Barton Alton Short, Appellant's father, but had been unsuccessful in obtaining any records. (Exhibit C). Appellant's Application contends these items constitute the "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective. Accordingly, Appellant urges this Court to so find and to order an evidentiary hearing to fully address the ineffectiveness issue.

¶ 93 Rule 3.11(B)(3)(6) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial...." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i).

¶ 94 While Appellant has provided a great deal of information in his affidavits, he has failed to set forth sufficient evidence to warrant an evidentiary hearing. During the second stage of trial, Appellant called as mitigation witnesses his sister and two of his cousins. These women testified to the neglectful and abusive conditions Appellant suffered while growing up. The statements made by Mrs. Hexemer in Exhibit B are much the same. Also testifying at trial for the defense was Dr. Wanda Draper, a Ph.D. and clinical professor in the psychiatry department of the Oklahoma College of Medicine. She stated that she had interviewed Appellant, his sister, and a cousin, and reviewed records from the Department of Human Services concerning Appellant as well as records pertaining to Appellant's military history, medical history, family history, childhood, his mother and her personal history, records on other family members, and police reports. Based upon all of the above, she testified to her evaluation of Appellant. Her conclusions are very similar to those offered by Dr. Hand in Exhibit A. The information contained in Exhibits A and B is merely cumulative to that offered at trial. Appellant has failed to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify Dr. Hand and Mrs. Hexemer as potential mitigation witnesses.

¶ 95 Appellant's claim in Exhibit C is merely a request for more time to develop and investigate additional mitigating evidence that he claims was available but not discovered by trial counsel. We fail to see how counsel was ineffective for failing to obtain the prison records on Appellant's father.

¶ 96 Upon review of the application and the supporting affidavit, we find Appellant has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to request a continuance of the trial. *Darks,* 954 P.2d at 168. Accordingly, we decline to grant Appellant's application for an evidentiary hearing.

## ACCUMULATION OF ERROR CLAIM

¶ 97 In his fifteenth assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State,* 780 P.2d 201, 209 (Okl.Cr.1989); *Weeks v. State,* 745 P.2d 1194, 1196 (Okl.Cr.1987). However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Bechtel v. State,* 738 P.2d 559, 561 (Okl.Cr.1987). While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

## MANDATORY SENTENCE REVIEW

¶ 98 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of three (3) aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; 2) the murder was especially heinous, atrocious, or cruel; and 3) there was an existence of a probability that the defendant would commit criminal acts of violence that would consti-

tute a continuing threat to society. 21 O.S. 1991, § 701.12(2)(4)(7). Each of these aggravators was supported by sufficient evidence.

¶ 99 The aggravator of "especially heinous, atrocious or cruel" is supported by evidence that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. *Hain v. State,* 919 P.2d 1130, 1146 (Okl.Cr.1996). Here, the victim suffered severe burns to 95% of his body; 82% of those burns being 3rd degree burns and the remainder 2nd degree burns. The victim was conscious prior to being taken to the hospital and for a period of time after his arrival. This evidence of conscious physical suffering is sufficient to support the aggravator.

¶ 100 To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. *Id.* at 1147. A finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society is appropriate when the evidence establishes the defendant participated in other unrelated criminal acts and the nature of the crime exhibited the calloused nature of the defendant. *Battenfield v. State,* 816 P.2d 555, 566 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992). To prove this aggravating circumstance, this Court has held "the State may present any relevant evidence, in conformance with the rules of evidence, ... including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence." *Id.*

¶ 101 In the present case, the State presented evidence from three witnesses, testimony plus victim protection orders, concerning various acts of violence and threats of violence committed against them by Appellant. This evidence, plus the obvious callousness of Appellant's throwing a firebomb into an occupied apartment, located inside a com-

plex of buildings, and then his admission to the act, is sufficient to support this aggravator. *See Hain,* 919 P.2d at 1147–48 (in determining the callousness of the crime, the defendant's attitude is critical to the determination of whether he poses a continuing threat to society.) This evidence shows Appellant has a propensity toward violence which makes him a continuing threat to society.

¶ 102 Finally, the aggravator of "great risk of death to more than one person" is supported by evidence that Appellant threw the firebomb into an apartment occupied by five people and the apartment was in close proximity to numerous other apartments, all occupied. *See Turrentine,* 965 P.2d at 978.

¶ 103 Having found the aggravators supported by sufficient evidence, we turn to the mitigating evidence. Appellant presented seven (7) witnesses: his sister, two cousins, two jailers from the Oklahoma City Jail, the volunteer chaplain at the Oklahoma City Jail, and Dr. Draper. These witnesses testified that Appellant was raised in an abusive home where he witnessed his alcoholic father beat his mother and where he himself was physically abused; he was often abandoned by his parents when they were sent to prison or just ran off; his mother was a prostitute who sometimes performed her work in his presence, and a drug addict who introduced Appellant to drugs; he grew up in extreme poverty and was taught to steal by his parents; he acted out of extreme emotional impulse; he adjusted well in structured environments, *i.e.* living with his cousins at certain time periods when he was a child and later as an adult incarcerated in the Oklahoma City Jail; and his life has meaning to his friends and loved ones who would visit him if he was incarcerated. This evidence was summarized into thirteen (13) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.

¶ 104 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substan-

tiated and appropriate as to Count I, First Degree Murder. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENTS** and **SENTENCES** for First Degree Murder and five counts of Attempt to Kill, After Former Conviction of Two or More Felonies are **AFFIRMED** and the **APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMENDMENT CLAIMS IS DENIED.**

STRUBHAR, P.J., and LILE, J., concur.

JOHNSON, J., specially concurs.

CHAPEL, J., concurs in results.

JOHNSON, Judge: special concur:

¶ 1 I specially concur with the opinion by Judge Lumpkin herein. I do wish to point out certain items that are especially troubling in this particular case.

¶ 2 Victim impact statements or testimony is highly emotional. Courts must be very sensitive to follow the guidelines that this Court established in *Cargle v. State,* 1995 OK CR 77, ¶¶ 77–79, 909 P.2d 806, 828.

¶ 3 It is important to note in this case that the testimony of Mrs. Yamamoto was not objected to until after she had completed her victim impact statement. Further, the complained of article from the Oklahoma City University campus newspaper was admitted by stipulation. As the Court pointed out, a harmless error analysis is proper in this particular case as it relates to Mrs. Yamamoto's statement and the information contained in the campus newspaper.

¶ 4 Trial courts should be very careful not to allow victim impact evidence from parties who are not of the victim's family or someone designated by the family. How far this Court will go in allowing victim impact evidence from persons not of the victim's family or designated by the family because it meets the "financial, emotional, psychological, and

physical effects," part of the statute may have to wait for another day. Any such evidence should be restricted to a "quick" glimpse. *Cargle,* 1995 OK CR 77, ¶ 75, 909 P.2d at 828.